**Frank McKITHEN, Plaintiff–Appellant,**

v.

**Richard BROWN, District Attorney, County of Queens, New York, Defendant–Appellee.***

**Docket No. 03–0168–pr.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 3, 2006.

Decided: March 13, 2007.

* This caption varies from the official caption, which is incorrect in certain respects. The 2 Clerk of the Court is directed to amend the official caption accordingly.

Janet Carter and Anne K. Small, Wilmer Cutler Pickering Hale and Dorr LLP, New York, N.Y. (Paul A. Engelmayer and Christopher J. Meade, on the brief) (Larry W. Yackle, Boston University School of Law, Boston, MA, on the brief) (Daniel J. Meltzer, Cambridge, MA, of counsel), for Plaintiff–Appellant.

Drake A. Colley, Assistant Corporation Counsel, for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, N.Y. (Leonard Koerner and Edward F.X. Hart, of counsel), for Defendant–Appellee.

Before: CALABRESI, KATZMANN and B.D. PARKER, Circuit Judges.

CALABRESI, Circuit Judge:

Eighty-four years ago, Judge Learned Hand observed that "[o]ur procedure has

been always haunted by the ghost of the innocent man convicted," but posited, optimistically, that "[i]t is an unreal dream." *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y.1923). Today, with the advance of forensic DNA technology,[1] our desire to join Learned Hand's optimism has given way to the reality of wrongful convictions[2] —a reality which challenges us to reaffirm our commitment to the principle that the innocent should be freed.[3]

The case *sub judice* arises at this intersection of scientific advance and enduring constitutional values. In it, we are asked to determine whether there exists a right, grounded in the Due Process Clause of the Fifth and Fourteenth Amendments to the federal Constitution, to post-conviction DNA testing. And, in addition to implicating fundamental questions of constitutional principle, the matter has extraordinary practical significance not only to those who claim they were falsely accused and wrongfully convicted, but also to state and local governments on whom the burdens of

any such right to be tested would principally fall.

Not surprisingly, the issue of post-conviction DNA testing has in recent years captured the attention of the Congress and the legislatures of nearly every state in the nation.[4] *See, e.g.*, Innocence Protection Act of 2004, 18 U.S.C. § 3600(a) (providing, in certain defined circumstances, for post-conviction DNA testing of prisoners convicted under federal and some state laws); National Conference of State Legislatures, Post–Conviction DNA Motions, at http://www.ncsl.org/programs/cj/postconv iction.htm (Jan.2006) (collecting state legislation providing for post-conviction DNA testing). As a result, our court must approach the question with utmost care and discreetness, not only because of the constitutional and practical significance of the issue, but also because of "[t]he imperative of according respect to the Congress," *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004), as well as state legisla-

---

**1.** *See generally Harvey v. Horan*, 285 F.3d 298, 305 & n. 1 (4th Cir.2002) *("Harvey II")* (Luttig, J., respecting the denial of rehearing en banc) (exploring how "the new forensic DNA technology ... is qualitatively different from all that proceeded it" in that it "increas[es] exponentially the reliability of forensic identification over earlier techniques," and noting that there is "now widespread agreement within the scientific community that this technology ... can distinguish between any two individuals on the planet, other than identical twins, the statistical probabilities of [Short Tandem Repeat] DNA matches ranging in the hundreds of billions, if not trillions").

**2.** As of March 12, 2007, by one count, as many as 197 factually innocent, incarcerated individuals have been exonerated by post-conviction DNA testing. *See* The Innocence Project, http://www.innocenceproject.com (last visited Mar. 12, 2007). And "DNA exonerations have disclosed deliberate (and in some cases criminal) police and prosecutorial misconduct in obtaining the tainted convictions." Seth F. Kreimer & David Rudovsky, *Double*

*Helix, Double Bind: Factual Innocence and Postconviction DNA Testing*, 151 U. Pa. L.Rev. 547, 563 (2002).

**3.** *See, e.g., In re Winship*, 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) ("[I]t is far worse to convict an innocent man than to let a guilty man go free."); William Blackstone, 4 Commentaries *352 ("[B]etter that ten guilty persons escape, than that one innocent suffer."); *see generally* Alexander Volokh, *n Guilty Men*, 146 U. Pa. L.Rev. 173 (1997). Notably, DNA testing— with its capacity to "exonerat[e] defendants (or those wrongly convicted) to a practical certainty," *Harvey II*, 285 F.3d at 305 n. 1 (Luttig, J., respecting the denial of rehearing en banc), and to identify the guilty—promises to render, in some cases, both sides of Blackstone's maxim obsolete.

**4.** It has also received significant attention from the President. *See* President's DNA Initiative, at http://www.dna.gov/uses/postconvi ction/ (last visited on Feb. 16, 2007).

tures, in their treatment of this multifaceted question. Yet at the same time, "[i]t is emphatically the province and duty of the judicial department to say what the law [of the Constitution] is." *Tinelli v. Redl*, 199 F.3d 603, 607 (2d Cir.1999) (per curiam) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (internal quotation marks omitted and first alteration in original)).

Defendant–Appellant Richard Brown ("Brown") contends that we should not, in this case, address the question at all. First, Brown argues that the district court below, pursuant to the *Rooker–Feldman* doctrine, properly dismissed the suit for lack of subject matter jurisdiction. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (examining the scope of the *Rooker–Feldman* doctrine) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). Second, and alternatively, Brown asserts that, even if the district court erred in applying the *Rooker– Feldman* doctrine, Plaintiff–Appellant Frank McKithen ("McKithen") failed to state a claim upon which relief may be granted because he could only seek post-conviction access to, or testing of, evidence by way of a habeas corpus proceeding. *See Heck v. Humphrey*, 512 U.S. 477, 481– 82, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (holding that a prisoner's claim is not cognizable under 42 U.S.C. § 1983—and thus can only be brought as a habeas petition— where "establishing the basis for the . . . claim *necessarily demonstrates* the invalidity of the [prisoner's] conviction" (emphasis added)). And third, Brown argues that, even if the first two arguments are incorrect—and that, therefore, McKithen did state a claim over which the district court had subject matter jurisdiction, and

upon the merits of which relief could. be granted—McKithen nevertheless was not entitled to "relitigate" the question of post-conviction DNA testing, because the district court was bound to recognize the issue- and claim-preclusive effects of an earlier state-court judgment rendered against McKithen.

Brown's first and second arguments are unconvincing. And this leads us to remand the case to the district court for its consideration, in the first instance, of the merits of McKithen's claim. In particular, the district court on remand should address in the first instance (1) whether there exists a post-conviction constitutional right of access to evidence for purposes of potentially exonerative DNA testing, and (2) whether that right was infringed in McKithen's case.

With respect to Brown's third argument, we hold (1) that Brown waived his claim preclusion defense, and that, on the facts of this case, it would be inappropriate for us to raise the defense *nostra sponte*, and (2) that, on remand, the district court should consider—if it concludes that a constitutional right exists—whether the contours of that right are sufficiently similar to the state standards previously adjudicated so that issue preclusion would apply.

## BACKGROUND

McKithen was convicted in 1993 of attempted murder and related charges, in New York Supreme Court, Queens County ("Queens County Court"). At trial, the prosecution argued that, on the night of August 21, 1992, McKithen unexpectedly appeared at the apartment he had once shared with his estranged wife; dashed to the kitchen and grabbed a knife; stabbed his wife in the lower back as she was escaping out of a bedroom window; and then immediately fled the apartment. A

distinctive knife, which McKithen's wife positively identified as the weapon used against her, was admitted into evidence at trial but was never subjected to DNA or fingerprint testing.

The jury found McKithen guilty of attempted murder in the second degree and related charges. On appeal, the Appellate Division affirmed his conviction. The court modified McKithen's sentence so that the terms imposed on the various charges would run concurrently. *People v. McKithen*, 221 A.D.2d 476, 634 N.Y.S.2d 128 (1995). The New York Court of Appeals denied leave to appeal. *People v. McKithen*, 88 N.Y.2d 881, 645 N.Y.S.2d 456, 668 N.E.2d 427 (1996).

In 2001, seven years after he had been convicted, McKithen moved in Queens County Court, pursuant to N.Y.CRIM. PROC. LAW § 440.30(1–a)(a), to compel, *inter alia*, DNA testing of the knife admitted into evidence at trial. Subsection 1–a(a) of § 440.30 provides:

> Where the defendant's motion requests the performance of a forensic DNA test on specified evidence, and upon the court's determination that any evidence containing [DNA] was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a *reasonable probability* that the verdict would have been *more favorable* to the defendant.

*See* N.Y.CRIM. PROC. LAW § 440.30(1–a)(a) (emphases added). In his motion, McKithen asserted that DNA testing "might have exonerated [him] of the crime for which he was convicted." The Queens County Court concluded that "there is no reasonable probability that the results of

such testing would have resulted in a verdict more favorable to [McKithen]," and denied McKithen's motion. Decision and Order of the Honorable John Latella, New York State Supreme Court, dated Nov. 8, 2001.

In March 2002, McKithen, incarcerated and proceeding *pro se*, brought this § 1983 suit in the United States District Court for the Eastern District of New York (Gleeson, *J.*). He claimed that Brown, Queens County District Attorney, violated his constitutional right of post-conviction access to evidence for DNA testing, and sought injunctive relief "[d]irecting ... DNA testing of the knife." McKithen asserted that DNA testing would "conclusively determine whether he is guilty of [a]ttempted [m]urder ..., and related charges for which he was convicted in state court ...."

Brown moved, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss McKithen's claim on four grounds: (1) the district court lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine; (2) McKithen failed to state a claim upon which relief may be granted because a claim seeking post-conviction access to evidence for DNA testing is not cognizable under § 1983; (3) the claim was barred by issue preclusion; and (4) McKithen failed to state a claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and otherwise failed to make out a "constitutional claim for a deprivation of due process." Neither in that motion nor in any other submission to the district court did Brown raise additional arguments for dismissal of McKithen's claim nor otherwise indicate a defense based on claim preclusion.

The district court referred the motion to United States Magistrate Judge Lois Bloom. In her Report and Recommenda-

tion, dated March 27, 2003, the magistrate judge observed that the circuits have split over whether actions seeking post-conviction access to DNA evidence are barred by *Heck v. Humphrey,* so that they may be brought only in a habeas corpus proceeding. The magistrate judge also noted that courts have disagreed as to "whether there exists any substantive or procedural right to post-conviction DNA testing." Although our circuit had not taken a position on either issue, the magistrate judge concluded that the district court "need not weigh in on this debate," because McKithen's suit could be dismissed, pursuant to the *Rooker–Feldman* doctrine, for lack of subject matter jurisdiction. The magistrate judge acknowledged that McKithen's "claim to DNA testing [wa]s being raised as a constitutional claim for the first time in the instant § 1983 action," and that his § 440.30 motion involved a statutory right to testing under state law. Nevertheless, the magistrate judge concluded that McKithen's suit was barred by the *Rooker–Feldman* doctrine because the § 1983 claim is identical to the "underlying issues" raised by the state-court motion, and therefore "succeeds only to the extent that the state court wrongly decided the issues before it."

The magistrate judge emphasized the "limited nature" of the report and recommendation:

> There has been no attempt to define the parameters of any constitutional right to post-conviction DNA testing as on these facts, the Court need not decide whether such a right exists. The Court finds only that the purported constitutional right as claimed by plaintiff would require this Court to revisit the same issues previously decided by the state court and therefore, this Court lacks jurisdiction pursuant to the *Rooker–Feldman* doctrine.

By order dated April 15, 2003, the district court adopted the report and recommendation of the magistrate judge in its entirety and dismissed McKithen's § 1983 suit for lack of subject matter jurisdiction.[5] This timely appeal followed.

## DISCUSSION

On appeal, McKithen argues (1) that his § 1983 suit is not prohibited by the *Rooker–Feldman* doctrine; (2) that his claim is cognizable under § 1983; (3) that litigation of his claim is not precluded by res judicata or collateral estoppel; and (4) that, on the merits, he has a post-conviction constitutional right of access to evidence in order to conduct potentially exonerative DNA testing. We consider each of these arguments in turn.

**I**

Relying on our court's decision in *Moccio v. New York State Office of Court Administration,* 95 F.3d 195, 199–200 (2d Cir.1996), in a which a panel of our court suggested that the *Rooker–Feldman* doctrine applies broadly and is effectively co-extensive with the ordinary application of preclusion law, the district court held that McKithen's § 1983 suit should be dismissed for lack of subject matter jurisdiction. We review this ruling *de novo. See Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 83 (2d Cir.2005). And, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), [we] ... may refer to evidence

---

5. The district court also noted that it had, on March 6, 2003, dismissed as time-barred under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), a habeas petition brought by McKithen which presented similar allegations. *See McKithen v. Walsh,* 03–CV–334 (E.D.N.Y. Mar. 6, 2003).

outside the pleadings." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). Moreover, given that McKithen was proceeding *pro se* in the district court, his submissions to that court "must be construed liberally." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam). We conclude that in view of the Supreme Court's recent decision in *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. 1517 (rejecting *Moccio's* approach), and our interpretation of that decision in *Hoblock,* 422 F.3d at 77, the district court's Rule 12(b)(1) dismissal cannot be sustained.

## A

"The *Rooker–Feldman* doctrine merely recognizes that 28 U.S.C. § 1331[, which provides that federal "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States,"] is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to [the Supreme] Court, see [28 U.S.C.] § 1257(a)." [6] *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 644 n. 3, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (holding that the *Rooker–Feldman* doctrine does not apply to a suit seeking review of state *agency* action). That the *Rooker–Feldman* doctrine is meant to occupy "narrow ground," see *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. 1517, is evidenced by the fact that the Supreme Court has only applied the doctrine twice—in the two cases after

which the doctrine was named. *See Rooker,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (dismissing for lack of subject matter jurisdiction a suit brought by plaintiffs in federal district court which sought to have a prior state court judgment, adverse to the plaintiffs, declared "null and void"); *Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (dismissing in part, for lack of subject matter jurisdiction, a law suit brought against a District of Columbia court that had denied plaintiffs' petition to sit for the bar examination).

Nevertheless, the *Rooker–Feldman* doctrine "has sometimes been construed [by lower courts] to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Exxon Mobil,* 544 U.S. at 283, 125 S.Ct. 1517. As an example of such an incorrect expansive reading, the High Court cited our decision in *Moccio,* 95 F.3d at 199–200. *Id.* And in rejecting *Moccio's* approach, the Court declared that "[t]he *Rooker–Feldman* doctrine . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 283–84.

---

6. 28 U.S.C. § 1257(a) provides:

Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in

question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

In *Hoblock*, our court observed that "[t]he Supreme Court has now told us that *Moccio* ... was incorrect .... *Exxon Mobil* teaches that *Rooker–Feldman* and preclusion are entirely separate doctrines." 422 F.3d at 85. The *Hoblock* panel then undertook the task of clarifying the limited scope of the *Rooker–Feldman* doctrine after *Exxon Mobil:*

> From [the opinion in *Exxon Mobil*], we can see that there are four requirements for the application of *Rooker–Feldman*. First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive.

*Hoblock*, 422 F.3d at 85 (internal citation omitted and alteration in original).

When the "procedural" requirements are met—as they are in McKithen's case because he lost in state court (the first requirement) and the state court's judgment was rendered before he brought his § 1983 suit (the fourth requirement)—

the application of the *Rooker–Feldman* doctrine turns on whether the second and third "substantive" requirements are met. And those substantive requirements, the *Hoblock* panel explained, can be reduced to the following statement: "federal plaintiffs are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment." *Id.* at 87 (emphasis in original).[7]

This, however, raises a further question: what constitutes "an injury caused by a state judgment"? To clarify this phrase—the full meaning of which is far from obvious—the *Hoblock* panel stated that "[t]he following formula guides our inquiry: a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 88. Yet the meaning and scope of the phrase "produced by a state-court judgment" is not—at least in all its applications—obvious either.

**B**

We need not fully disentangle these complexities to decide the case before us. What *Exxon Mobil* and *Hoblock* do make clear is that the applicability of the *Rooker–Feldman* doctrine turns not on the *similarity* between a party's state-court and federal-court claims (which is, generally

---

7. In reaching this conclusion, the panel reasoned that the phrases "inextricably intertwined" and "independent claim"—both of which the Supreme Court has employed, *see Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303; *Exxon Mobil*, 544 U.S. at 293, 125 S.Ct. 1517—only "state[ ] a conclusion," *Hoblock*, 422 F.3d at 86; they are simply "descriptive label[s] attached to claims that [either do or do not] meet the requirements outlined in *Exxon Mobil*," *id.* at 487; and

therefore they do not have substantive content independent of the four *Exxon Mobil* requirements. In other words, *Hoblock* instructs that if the requirements outlined in *Exxon Mobil* are met, then the claim asserted in federal court is "inextricably intertwined" with the claim raised in state court; if, however, the *Exxon Mobil* requirements are not met, the plaintiff must be said to have raised an "independent claim" in federal court.

speaking, the focus of ordinary preclusion law), but rather on the *causal relationship* between the state-court judgment and the injury of which the party complains in federal court. *See Hoblock*, 422 F.3d at 87 ("[A] plaintiff who seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of *Rooker–Feldman.*"); *Exxon Mobil*, 544 U.S. at 293, 125 S.Ct. 1517 (the *Rooker–Feldman* doctrine does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court," because "[i]f a federal plaintiff present[s] some independent claim[, i.e., a claim based on an injury that was not *caused by* the state-court judgment,] albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion" (internal quotation marks omitted) (second alteration in original)). Thus, whatever the full import of the "caused by" and "produced by" language, at least the following is evident: a party is not complaining of an injury "caused by" a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been "caused by" those proceedings.

That is precisely the case here. In seeking post-conviction access to, and DNA testing of, evidence, McKithen could have chosen to bring either his state § 440.30 motion or his federal § 1983 suit first. As he chose to litigate in state court first, principles of preclusion might apply. But, given that McKithen in federal court seeks redress for an injury that existed in its exact form prior to the state-court judgment, he cannot be complaining of an injury "caused by" the state court.[8] Rather, the preexisting injury in this case is properly understood to have been "simply ratified, acquiesced in, or left unpunished by [the state court]." *Hoblock*, 422 F.3d at 88.[9]

8. Our conclusion is bolstered by reference to *Hoblock's* fourth, "procedural," prong. That prong renders the *Rooker–Feldman* doctrine categorically inapplicable unless the relevant "state-court judgment [was] rendered before the district court proceeding commenced." *Hoblock*, 422 F.3d at 85. Yet, for purposes of determining whether a federal litigant is "complaining of injuries caused by state-court judgments," there would seem to be no meaningful distinction between (1) a district court proceeding that *could have been*, but was not, commenced before a state-court judgment was rendered, and (2) a district court proceeding that *in fact* was commenced before the state-court judgment (to which, in light of *Hoblock's* fourth prong, the *Rooker–Feldman* doctrine would never apply). Given that the *Rooker–Feldman* doctrine "has no application to federal-court suits proceeding in parallel with ongoing state-court litigation," *id.* at 85, it would seem that the doctrine would also have to be inapplicable to cases, like the one before us, in which the federal-court suit *could have* proceeded "in parallel with" or before the state-court litigation.

9. By no means does this suggest that, in order to avoid the *Rooker–Feldman* doctrine, a party's injury *must* have arisen prior to any state-court judgments. Obviously, an injury that arises at the same time or even after a state-court judgment might also arise independently of—that is, might arise without being "caused by"—that state-court judgment. The Supreme Court recognized as much in *Exxon Mobil* when it announced that the *Rooker–Feldman* doctrine does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter *previously* litigated in state court." *Exxon Mobil*, 544 U.S. at 293, 125 S.Ct. 1517 (emphasis added). Conversely, we do not suggest that an injury that arises prior to a state-court judgment, but that is intensified or altered by that judgment, can never be found to have been "caused by" the state-court judgment. Rather, we leave that question—which will require us to pin

We therefore hold that, under current Supreme Court and circuit law, the district court erred when it followed the then governing *Moccio* case and applied the *Rooker–Feldman* doctrine to bar McKithen's suit.

## II

 McKithen brings his suit under the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, which gives a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. While his claim undoubtedly comes "within the literal terms of § 1983," *Heck*, 512 U.S. at 481, 114 S.Ct. 2364, the Supreme Court has recognized "an implicit exception from § 1983's otherwise broad scope for actions that lie 'within the core of habeas corpus,'" *Wilkinson v. Dotson*, 544 U.S. 74, 79, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 487, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). Accordingly, we must now determine whether a claim asserting a post-conviction federal constitutional right of access to, and DNA testing of, evidence is cognizable under § 1983, or whether, instead, it lies so well "within the core of habeas corpus" that it may only be brought in a habeas petition.

The question has been an open one in this circuit. We today join the Seventh, Ninth, and Eleventh Circuits, and district courts in the First and Third Circuits, agreeing with them that a claim seeking post-conviction access to evidence for DNA testing may properly be brought as a § 1983 suit. *See Savory v. Lyons*, 469 F.3d 667, 669 (7th Cir.2006); *Osborne v. Dist. Attorney's Office for the Third Judicial Dist.*, 423 F.3d 1050, 1054 (9th Cir. 2005); *Bradley v. Pryor*, 305 F.3d 1287, 1290–91 (11th Cir.2002); *see also Wade v. Brady*, 460 F.Supp.2d 226, 237 (D.Mass. 2006) ("[Section] 1983 is an entirely appropriate medium for plaintiff to raise his claim for access to DNA testing."); *Derrickson v. Del. County Dist. Attorney's Office*, No. 04–1569, 2006 WL 2135854, at *8 (E.D.Pa. July 26, 2006) (same). In doing so we reject the position taken by three other circuits. *See Harvey v. Horan*, 278 F.3d 370, 375 (4th Cir.2002) *("Harvey I")* (holding that such a claim cannot be brought in a § 1983 action when a plaintiff "seek[s] access to DNA evidence for one reason and one reason only—as the first step in undermining his conviction")[10]; *Kutzner v. Montgomery County*, 303 F.3d 339, 340–41 (5th Cir.2002) (per curiam) (adopting the reasoning of *Harvey I); see also Boyle v. Mayer*, 46 Fed.Appx. 340, 340 (6th Cir.2002) (unpublished) (holding that a suit seeking DNA testing of

down, more precisely than is necessary here, the meaning of the "caused by" and "produced by" phrases—for another day.

**10.** Subsequent developments appear to have made it impossible for the Fourth Circuit to reconsider the *Harvey I* panel's decision. Following the issuance of the opinion in *Harvey I*, the case was mooted by a state-court order which granted to the plaintiff-appellee the relief he had been seeking in federal court. Against this backdrop, the plaintiff-appellee's petitions for rehearing and rehearing en banc were denied. *See Harvey II*, 285 F.3d at 304

(Luttig, J., respecting the denial of rehearing en banc) ("I concur in the court's judgment to deny rehearing of this case *en banc*, but I do so only because it appears that appellee Harvey will, pursuant to state court order entered after our panel's decision, be afforded the chance to subject the forensic evidence in question to further DNA tests—the same relief that he seeks from this court."); *id.* ("In light of this order, we likely do not have the authority to rehear this case even before the panel, much less before the court *en banc.*").

biological evidence is, in light of *Heck*, not cognizable under § 1983).

## A

■ While both § 1983 and the federal habeas statute, 28 U.S.C. § 2254 "provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials," the provisions "differ in their scope and operation." *Heck*, 512 U.S. at 480, 114 S.Ct. 2364. Thus, while exhaustion of state remedies generally " 'is *not* a prerequisite to an action under § 1983,' " *id.* (quoting *Patsy v. Bd. of Regents*, 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)), even in an action brought by a state prisoner, *id.*,[11] the federal habeas statute normally requires a state prisoner to exhaust state remedies before filing a habeas petition in federal court. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Woodford v. Ngo*, —— U.S. ——, ——————, 126 S.Ct. 2378, 2386–87, 165 L.Ed.2d 368 (2006) (explaining that "[a] state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his or her claims through one complete round of the State's established appellate review process" (citation and internal quotation marks omitted)). Similarly, the AEDPA time limitations and rules concerning successive petitions applicable to habeas are much more stringent than the normal limi-

tations statutes that control § 1983.[12] *See Muhammad v. Close*, 540 U.S. 749, 751, 124 S.Ct. 1303, 158 L.Ed.2d 32 (2004) (per curiam) (explaining that prisoners suing under § 1983 "generally face a substantially lower gate" than those prisoners petitioning for habeas). And, of course, given these differences, if § 1983 were *always* available, the procedural and the other like requirements of the federal habeas statute would be rendered nugatory.

■ Consequently, in *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court began its efforts to "harmoniz[e][t]he broad language of § 1983, a general statute, with the specific federal habeas corpus statute[, 28 U.S.C. § 2254]." *Heck*, 512 U.S. at 491, 114 S.Ct. 2364 (Thomas, J., concurring) (internal quotation marks omitted and second alteration in original). In *Preiser*, state prisoners had brought civil rights actions attacking the constitutionality of prison disciplinary proceedings that had led to the deprivation of their good-time credits, and sought solely equitable relief. In light of the "potential overlap" between § 1983 and the habeas provision, the Court crafted an implicit exception to the textual terms of § 1983 and held that "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier re-

---

**11.** One notable exception to the general rule that exhaustion of state remedies is not a prerequisite to a prisoner's § 1983 suit is the Prison Litigation Reform Act of 1995, 110 Stat. 1321, 1321–71, as amended, 42 U.S.C. § 1997e *et seq.* The PLRA provides that a prisoner seeking to bring a § 1983 suit "with respect to prison conditions" must first exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a); *see generally Woodford*, 126 S.Ct. at 2378.

**12.** Whereas AEDPA ordinarily requires a prisoner to file her habeas petition within a one-

year filing period, *see* 28 U.S.C. § 2244(d), "the statute of limitations applicable to claims brought under ... § 1983 in New York is three years," *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir.2004). Moreover, AEDPA strictly limits the ability of prisoners to file second or successive habeas petitions, *see* 28 U.S.C. § 2244(b), which is a limitation not faced by a § 1983 plaintiff. *See generally* Larry W. Yackle, *A Primer on the New Habeas Corpus Statute*, 44 Buff. L.Rev. 381 (1996) (describing AEDPA's various amendments to the federal habeas statute).

lease." *Id.* at 481, 93 S.Ct. 1827 (citing *Preiser*, 411 U.S. at 488–90, 93 S.Ct. 1827).

Over time, this implicit exception has been carefully circumscribed. *See Dotson*, 544 U.S. at 79, 125 S.Ct. 1242 (noting that the "implicit exception from § 1983's otherwise broad scope" recognized in *Preiser* covers only those "actions that lie 'within the core of habeas corpus' " (quoting *Preiser*, 411 U.S. at 487, 93 S.Ct. 1827)). And—as *Preiser* itself had suggested—the exception has been applied by the Supreme Court, in its post-*Preiser* case law, only when success for a prisoner in a § 1983 suit would *necessarily* result in the nullification of his conviction or the shortening of his confinement. Thus, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court held that inmates were permitted to bring a suit, pursuant to § 1983, (1) to obtain a declaration—"as a predicate to" their requested damages award—that the disciplinary procedures by which their good-time credits were deprived were invalid, as well as (2) to seek an injunction enjoining *prospective* enforcement of invalid prison regulations. *Id.* at 555, 94 S.Ct. 2963. In reaching these conclusions, the Court reasoned that, much as either form of relief might suggest—or be the first step in demonstrating—the invalidity of prisoners' sentences, "[i]n neither case would victory for the prisoners [in the § 1983 suit] *necessarily* have meant *immediate* release or a shorter period of incarceration." *Dotson*, 544 U.S. at 80, 125 S.Ct. 1242 (discussing *Wolff*) (emphases added); *see Wolff*, 418 U.S. at 555, 94 S.Ct. 2963 ("[I]t was proper for the [federal courts] to determine the validity of the procedures for revoking good-time credits and to fashion appropri-

ate remedies for any constitutional violations ascertained, short of ordering the actual restoration of good time already cancelled.").

Twenty years later, in *Heck v. Humphrey*, the Court reaffirmed that the exception recognized in *Preiser* applies only when "establishing the basis for [a prisoner's § 1983] claim *necessarily demonstrates* the invalidity of the conviction." *Heck*, 512 U.S. at 481–82, 114 S.Ct. 2364 (emphasis added). The plaintiff in *Heck* was an inmate who alleged that state officials unconstitutionally caused his conviction by improperly investigating his crime and destroying evidence. *Id.* at 479, 114 S.Ct. 2364. In holding that the plaintiff's claim was not cognizable under § 1983— even though the plaintiff only requested damages as relief—the Court explained that, in order for plaintiff to succeed on his damages claim, he would necessarily have to show, as a predicate to the award, that his conviction was invalid. Hence, success for the plaintiff would "necessarily demonstrate[ ] the invalidity of [his] conviction," and, since civil tort actions are "not appropriate vehicles for challenging the validity of outstanding criminal judgments," *id.* at 486, 114 S.Ct. 2364, "no cause of action under § 1983 [was available] . . . until the conviction or sentence [was] reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus," *id.* at 489, 114 S.Ct. 2364.[13]

In an important footnote, the Court in *Heck* reaffirmed the narrowness of *Preiser's* exception, by providing an instructive example of a § 1983 lawsuit which, under the standard articulated in *Heck*, would not be barred:

---

**13.** Because the standard enunciated in *Heck* generally bars a § 1983 suit that "necessarily demonstrates" the invalidity of a conviction or sentence "*unless* the plaintiff can demonstrate that the conviction or sentence has al-

ready been invalidated," *Heck*, 512 U.S. at 487, 114 S.Ct. 2364, the *Heck* rule has come to be known as the "favorable termination" requirement. *See generally Peralta v. Vasquez*, 467 F.3d 98 (2d Cir.2006).

For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful.

*Id.* at 487, 114 S.Ct. 2364 n. 7 (emphasis in original) (internal citations omitted). *Heck's* footnote 7 underscored that the *Preiser* exception does not bar a § 1983 action that, at most, increases the *likelihood* that a plaintiff will eventually be able to overturn a still-outstanding conviction, but which does not go so far as to *necessarily* demonstrate the conviction's invalidity. *See Nelson v. Campbell,* 541 U.S. 637, 647, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004) ("[W]e were careful in *Heck* to stress the importance of the term 'necessarily.' "); *Savory,* 469 F.3d at 672 ("The exception to § 1983 ... is a narrow one, designed to preserve the specific role of habeas corpus relief."); *cf. Anyanwutaku v. Moore,* 151 F.3d 1053 (D.C.Cir.1998) (holding that an inmate's constitutional challenge alleging miscalculation of a parole eligibility date was cognizable under § 1983, because such parole decisions were discretionary and hence, there was no guarantee the inmate would ultimately be released any earlier).

The High Court recently reiterated this point in *Dotson,* 544 U.S. 74, 125 S.Ct. 1242, 161 L.Ed.2d 253. In affirming, yet again, that the proper inquiry is whether "victory for the prisoners [would] necessarily have meant immediate release or a shorter period of incarceration," *id.* at 80, 125 S.Ct. 1242, the High Court deemed it irrelevant that a prisoner might, following success in a § 1983 suit, find himself in a better position to raise subsequent challenges to his conviction or sentence. Specifically, the *Dotson* Court allowed plaintiff inmates to proceed with their § 1983 suits when (1) success for one prisoner plaintiff would have meant, at most, speedier "*consideration* of a new parole application," and (2) success for the other prisoner would potentially have led to "a new parole hearing at which [state] authorities may, in their discretion, decline to shorten his prison term." *Id.* at 82, 125 S.Ct. 1242 (emphasis in original); *cf. Anyanwutaku,* 151 F.3d 1053.

■ We conclude that the governing standard for application of the *Preiser–Heck* exception, then, is whether a prisoner's victory in a § 1983 suit would *necessarily demonstrate* the invalidity of his conviction or sentence; that a prisoner's success might be merely helpful or *potentially* demonstrative of illegal confinement is, under this standard, irrelevant.

Moreover, given that the test is whether success in the § 1983 suit *sub judice* will necessarily demonstrate the invalidity of a conviction or sentence—and not whether a plaintiff *intends* to bring subsequent challenges—a prisoner's motives for bringing a § 1983 suit are, as *Dotson* observes, also plainly beside the point. *Dotson,* 544 U.S. at 78, 125 S.Ct. 1242 ("The problem with Ohio's argument lies in its jump from a true premise (that in all likelihood the prisoners hope these actions will help bring about earlier release) to a faulty conclusion (that habeas is their sole avenue for relief).").

**B**

Were McKithen to prevail on the merits, he would obtain only an injunction requiring that the knife be made available for DNA testing. Such testing, of course, "*necessarily* implies nothing at all about

the plaintiff's conviction." *Harvey II*, 285 F.3d at 308 (Luttig, J., respecting the denial of rehearing en banc) (emphasis in original). That is because "[t]he results of any DNA tests that are eventually performed may be inconclusive, they may be insufficiently exculpatory, or they may even be inculpatory." *Id.* Moreover, even if the results of DNA testing prove exculpatory, McKithen would then have to initiate an entirely separate lawsuit—presumably as a habeas petition, subject to all the procedural and other AEDPA limitations—in which he would have to argue that the state has violated his constitutional rights by continuing to imprison him in light of the exculpatory evidence.[14] *See id.*

It follows that—even if success for the plaintiff might well make it *more likely* that the plaintiff, in a subsequent proceeding, may eventually be able to make a showing that his conviction was unlawful, *see Dotson*, 544 U.S. at 80, 125 S.Ct. 1242; *Heck*, 512 U.S. at 481–82, 114 S.Ct. 2364; *Wolff*, 418 U.S. at 555, 94 S.Ct. 2963;

*Preiser*, 411 U.S. at 482, 489–90, 93 S.Ct. 1827, and even if a plaintiff's ultimate motive is to challenge his conviction—a post-conviction claim for access to evidence is cognizable under § 1983. *See Savory*, 469 F.3d at 672; *Osborne*, 423 F.3d at 1054–55; *Bradley*, 305 F.3d at 1290–91; *Wade*, 460 F.Supp.2d at 237–39; *Derrickson*, 2006 WL 2135854, at *8.[15]

## III

As the Supreme Court made clear in *Exxon Mobil*, "a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment" even if there is jurisdiction to hear the merits of the claim, and the claim is otherwise properly presented. *Exxon Mobil*, 544 U.S. at 293, 125 S.Ct. 1517; *see Hoblock*, 422 F.3d at 92 (citing *Exxon Mobil*). In determining whether claim or issue preclusion applies, our inquiry is governed by New York state law. *See* 28 U.S.C. § 1738 ("Such . . . judicial proceed-

14. In such a subsequent habeas proceeding, the state would not, of course, be collaterally estopped from arguing (1) that the results of the DNA testing do not, in fact, exculpate McKithen; or (2) that, even if the results are to some degree exculpatory, they are insufficient to show that McKithen's imprisonment is unconstitutional.

15. Defendant Brown relies on the Fourth Circuit's decision in *Harvey I* for the proposition that *Heck* bars any § 1983 suit that is brought "for one reason and one reason only—as the first step in undermining [a plaintiff's] conviction." And "it may not be denied," Brown continues, "that, at bottom, [McKithen] seeks further DNA testing for the sole purpose of attempting to demonstrate his innocence of the crime for which he was convicted." But this approach, which focuses not on whether success for the § 1983 plaintiff necessarily implies the invalidity of his conviction or sentence, but rather on the question of the plaintiff's motives in bringing the suit, was laid to rest by the Supreme Court in *Dotson*. *See Dotson*, 544 U.S. at 78, 125 S.Ct. 1242; *see*

*supra*. It is now beyond dispute that a § 1983 plaintiff's unspoken motives—as contrasted with the relief the plaintiff has in fact sought—are merely red herrings.

On this point, we note that the Fourth Circuit (whose reasoning the Fifth Circuit—and, arguably, the Sixth Circuit—adopted shortly after *Harvey I* was decided) relied heavily on the assumed beliefs and motivations of the § 1983 plaintiff. *See, e.g., Harvey I*, 278 F.3d at 375 ("Harvey is seeking access to DNA evidence [because] . . . [h]e *believes* that the DNA test results will be favorable and will allow him to bring a subsequent motion to invalidate his conviction. As such, an action under 42 U.S.C. § 1983 cannot lie.") (emphasis added). This approach is no longer tenable after *Dotson*. *See supra*. Hence, it comes as no surprise that courts in every circuit to have weighed in on the issue after *Dotson*—the Seventh and Ninth Circuit, and district courts in the First and Third Circuit—have rejected *Harvey I*, and instead sided with the Eleventh Circuit. Today we join this emerging consensus.

ings ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."); *see also Hoblock*, 422 F.3d at 93; *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986). We therefore consider, in turn, Brown's arguments that we are barred from considering McKithen's claim (1) by claim preclusion, and (2) by issue preclusion.

## A

 The doctrine of claim preclusion, also referred to as res judicata, prevents a plaintiff from raising a claim that was or could have been raised in a prior suit. New York law has adopted a "transactional approach" to claim preclusion. *See, e.g., Gargiul v. Tompkins*, 790 F.2d 265, 269 (2d Cir.1986) (citing *Reilly v. Reid*, 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978)). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transaction are barred...." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158 (1981).

 Under Rule 8 of the Federal Rules of Civil Procedure, which governs general pleading rules in federal court, "[p]reclusion ... is not a jurisdictional matter." *Exxon Mobil*, 544 U.S. at 293, 125 S.Ct. 1517 (citing Fed.R.Civ.P. 8(c), which lists claim preclusion as an affirmative defense). As such, the defense of claim and issue preclusion may be waived by the parties, *see Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir.2004) ("Generally a failure to plead an affirmative defense results in a waiver." (internal citations and quotation marks

omitted)); *Scherer v. Equitable Life Assurance Soc'y*, 347 F.3d 394, 398 (2d Cir. 2003) ("The preclusion doctrines ... are waiveable affirmative defenses."); *Curry v. City of Syracuse*, 316 F.3d 324, 330–31 (2d Cir.2003) ("[C]ollateral estoppel, like res judicata, is an affirmative defense.... [I]t normally must be pled in a timely manner or it may be waived."), and we are under no obligation to raise the issue *nostra sponte, Scherer*, 347 F.3d at 398 n. 4 (noting that although a court is "free to raise that defense *sua sponte*, even if the parties have seemingly waived it," there is "no obligation on the part of a court to act *sua sponte* and interpose the defense if it has not been raised"). Indeed, our court has recognized that *sua sponte* application of claim preclusion is "not always desirable." *Id.*

 On appeal, Brown concedes that "claim preclusion ... was not specifically raised below," but insists that we should apply the defense *nostra sponte* "for the sake of judicial economy." As support, Brown asserts that "appellant's due process claim in this action is precisely the same claim he raised in his state [§ ] 440.30 claim, now couched in due process terminology, and could have been raised in the state action." He remarks that McKithen—who has remained incarcerated throughout, and proceeded *pro se* in the state and district court post-conviction proceedings—"should not now be rewarded for his failure" to raise the same claim in this action.

Brown's arguments are without merit. As McKithen rightly rejoins, Brown has offered us no support for the "naked assertion" that McKithen could have brought a federal constitutional claim as part of his § 440.30 motion. Indeed this may be an open question of state law.[16] Even if it

---

**16.** The only case that Brown cites in support

of this assertion is *People v. De Oliveira*, 223

were not, however, and assuming further that its answer would cut in Brown's favor, we conclude that it would still be inappropriate, in this case, to invoke claim preclusion *nostra sponte* given, as McKithen notes, "the seriousness of the crime [of which he was convicted], the length of the sentence, the fact that the claim goes to innocence, and that McKithen proceeded *pro se* in state court."

Brown has waived the defense of claim preclusion, and, given the circumstances of this case, we decline to invoke the defense *nostra sponte.*

### B

Brown did raise the defense of issue preclusion, i.e., collateral estoppel, in the district court, and we therefore must decide whether the defense applies. Our inquiry is governed by New York state law. *See* 28 U.S.C. § 1738; *Hoblock,* 422 F.3d at 92–93.

■ Under New York law, collateral estoppel will preclude a federal court from deciding an issue if " '(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding.' " *Vargas v. City of New York,* 377 F.3d 200, 205–06 (2d Cir.2004) (quoting *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995)). We have said that, "dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by the judgment entered in the first action." *Sure–Snap Corp. v. State St. Bank & Trust Co.,* 948 F.2d 869, 874 (2d

Cir.1991) (internal quotation marks omitted). Importantly, we have also cautioned that "[i]ssue preclusion will apply only if it is *quite clear* that these requirements have been satisfied, lest a party be 'precluded from obtaining at least one full hearing on his or her claim.' " *Colon,* 58 F.3d at 869 (quoting *Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481, 485, 414 N.Y.S.2d 308, 311, 386 N.E.2d 1328 (1979)) (emphasis added).

Brown argues that "[o]nly by overturning the ruling of the state court could the federal court grant appellant's relief." The state court, in denying McKithen's § 440.30 motion to have the knife tested, reached the conclusion that McKithen did not meet the state-law standards for DNA testing. And Brown insists that McKithen could prevail on his federal claim only if the federal district court were to disregard the state court's holding on this point. But that is only so if the federal constitutional right to DNA testing is the same as or lesser than (and included in) the state statutory right. In other words, it "ain't necessarily so."

Under N.Y.CRIM. PROC. LAW § 440.30(1–a)(a), the state court was required to decide whether McKithen met the state-law "reasonable probability" and "more favorable" standards. *See supra.* At this stage of the proceedings, we are unable to rule on whether, assuming that a federal constitutional right to post-conviction DNA testing exists, the standards for proving a violation of that right are more, or less, stringent than those of the state statute.

It is not at all inevitable that the federal constitutional right, if it exists, will look

A.D.2d 766, 767, 636 N.Y.S.2d 441, 442 (App. Div.1996), but that opinion is not on point. In *De Oliveira,* the plaintiff had raised various unrelated constitutional grounds on which to vacate his conviction under § 440.10 and had

also sought DNA testing under state law pursuant to § 440.30. Thus the decision does not appear to support the assertion that federal constitutional claims can be brought as part of a § 440.30 motion itself.

precisely like the state statutory right. Even apart from the possibility that the federal constitutional right might be, in some applications, more readily available than the state statutory right, McKithen rightly notes that DNA may have a variety of uses that are not captured in the state statute's trial-focused standard. For example, it might aid in clemency proceedings; evidence might be probative enough to warrant executive intervention even if it did not meet the state law "reasonable probability" threshold. Alternatively, the DNA evidence might be useful to a prisoner with an indeterminate sentence, such as McKithen, in obtaining parole—even if the evidence is insufficient to create a "reasonable probability" of a different verdict.

For these reasons, we cannot find, at this juncture, that issue preclusion applies. Instead, we leave the defense for the district court to consider on remand when the stage is properly set for it. If the district court concludes that there exists a constitutional right on the basis of which McKithen might obtain his requested relief (a question which, as we explain below, is best left for the district court to consider in the first instance), it should then consider whether the contours of that right are sufficiently similar to—or narrower than and incorporated in—the previously adjudicated state statutory standard as to collaterally estopp McKithen's claim.

## IV

The district court, viewing itself bound to dismiss the suit for lack of subject matter jurisdiction pursuant to the *Rooker–Feldman* doctrine, did not address the merits of McKithen's § 1983 action. Because we vacate the district court's judgment on that point—and instead hold (1) that the district court did have jurisdiction, (2) that McKithen's suit is cognizable under § 1983, (3) that the defense of claim

preclusion was waived, and (4) that we cannot determine whether issue preclusion applies before determining whether the federal constitutional right exists and what its contours are—the extraordinarily important, and delicate, constitutional issue which McKithen has sought to litigate is squarely before us.

But we decline to rule on it now. Instead, because of the fact-intensive nature of the inquiry—and, as noted earlier, in light of the need to approach the issue cautiously—we remand the question to the district court for its examination in the first instance. The same considerations that lead us to remand, however, counsel in favor of our providing the district court some guidance as to how its inquiry might proceed.

* * * *

The Supreme Court has made clear that prisoners lawfully deprived of their freedom retain substantive liberty interests under the Fourteenth Amendment. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ("The mere fact that [plaintiff] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment."); *see also Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (holding that convicted felon retains a post-conviction liberty interest in avoiding transfer to a mental institution without due process); *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (holding that parolee has a post-conviction liberty interest which "includes many of the core values of unqualified liberty"). The district court, on remand, must, therefore, first consider whether this residual post-conviction liberty interest encompasses an interest in accessing or possessing potentially exonerative biological

evidence. *Compare Harvey II*, 285 F.3d at 312, 312–15 (Luttig, J., respecting the denial of rehearing en banc) ("I believe, and would hold, that there does exist such a post-conviction right of access to evidence.") *with Harvey I*, 278 F.3d at 388 (King, J., concurring in part and concurring in the judgment) (concluding that the defendant had "no post-conviction legal right to access or discover the [biological] evidence relating to his ... conviction"). *See also Grayson v. King*, 460 F.3d 1328, 1340–41 (11th Cir.2006) (declining to weigh in on "the thorny threshold issue").

If the district court concludes that this post-conviction liberty interest exists, then procedural due process applies to its deprivation. On this point, the district court's inquiry should begin with the framework established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for analyzing procedural due process claims.[17] *Mathews* applies, rather than the more demanding *Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), because McKithen is not bringing a challenge to his underlying conviction or to "the process afforded during criminal proceedings themselves," *Krimstock v. Kelly*, 464 F.3d 246, 254 (2d Cir.2006), but instead is seeking *post*-conviction access to evidence. *See Harvey II*, 285 F.3d at 315 n. 6 (Luttig, J., respecting the denial of rehearing en banc) (concluding that *Mathews*, rather than *Medina*, "provides the proper analytical framework for determining whether there exists a procedural due process right to such ac-

cess" because "[t]he asserted right of access does not entail a challenge to the underlying conviction, and neither (at least comfortably) is the state's denial of access equivalent to a state rule of criminal procedure governing the process by which one is tried and found guilty or innocent of criminal offense"); *cf. Krimstock*, 464 F.3d at 254 (holding that *Mathews* applies to a case involving an alleged deprivation of property *pending* a criminal proceeding).

Under the *Mathews* framework,

identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *see also United States v. Ruiz*, 536 U.S. 622, 631, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (same).

Under *Mathews* the cases inevitably turn on their particular facts—which in the instant case include the availability of statutory avenues of relief, such as state or federal legislation providing for DNA testing,[18] and the seriousness of the crime and

---

**17.** Its inquiry should not *end* there. Another possible source of a constitutional right of access is substantive due process. *See Harvey II*, 285 F.3d at 318–20 (Luttig, J., respecting the denial of rehearing en banc) ("[U]nder established Supreme Court precedent there might well be a straightforward *substantive* due process right to [post-conviction] access [to evidence]." (emphasis in original)); *see*

*also County of Sacramento v. Lewis*, 523 U.S. 833, 856–57, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (Kennedy, J., joined by O'Connor, J., concurring) ("It can no longer be controverted that due process has a substantive component....").

**18.** Because the *Mathews* framework takes into account "the probable value, if any, of additional or substitute procedural safe-

sentence involved.[19] *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ("It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.' ") (quoting *Morrissey,* 408 U.S. at 481, 92 S.Ct. 2593); *Mathews,* 424 U.S. at 334, 96 S.Ct. 893 ("[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstance[ ]." (internal quotation marks omitted)).

It is also worth noting that the right asserted by McKithen in this case, while implicating questions of tremendous importance, is narrow in its reach. McKithen does not, for example, at all challenge the state's procedures for the collection and storage of biological evidence—procedures for which cost is clearly a significant concern. Rather, McKithen's seeks only access to, and perhaps testing of, biological evidence already in the state's possession. Moreover, at oral argument, McKithen indicated that he would be able to cover the costs of DNA testing himself, and, therefore, would not need to argue that the defendant should be compelled to conduct the testing for him.

We deem it appropriate to leave factual questions, such as the cost to the state—and the interaction between such facts and

the constitutional right asserted—for the district court to consider in the first instance.

## CONCLUSION

For the foregoing reasons, the district court's judgment is VACATED, and the case is REMANDED to the district court, for it to consider whether there exists a constitutional right on the basis of which Plaintiff–Appellant might be able to obtain the relief he requests, and if there is such a right, whether, once the district court defines the contours of that right, Plaintiff–Appellant's claim is collaterally-estopped by the earlier state court decisions.

guards"—which value will depend, in large part, upon the availability of adequate statutory avenues of relief—there is, we believe, no basis to the view that recognizing longstanding principles of procedural due process "in the face of [considerable] legislative activity and variation is to evince nothing less than a loss of faith in democracy." *Harvey II,* 285 F.3d at 303 (Wilkinson, C.J., concurring in the denial of rehearing and rehearing en banc). Rather, the *Mathews* framework expressly *encourages* legislatures to develop appropriate procedures to ensure that a miscarriage of justice does not occur.

19. There can be no doubt, for example, that a prisoner facing capital punishment would

have a considerably more compelling claim under *Mathews*—as well as under substantive due process—than one, like McKithen, who seeks to avoid the remainder of a prison sentence. *See Herrera v. Collins,* 506 U.S. 390, 419, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (O'Connor, J., joined by Kennedy, J., concurring) (expressing agreement "with the fundamental legal principle that executing the innocent is inconsistent with the Constitution" and noting that "[r]egardless of the verbal formula employed ... the execution of a legally and factually innocent person would be a constitutionally intolerable event").