Torraco v. Port Authority of New York & New Jersey; Weasner v. Suffolk County, New York

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued:  April 29, 2009                                    Decided:  June 30, 2010)

Docket Nos. 08-1768-cv, 08-1895-cv

_____

John Torraco, William Winstanley,

Plaintiffs-Appellants,

v.                                                    No. 08-1768-cv

Port Authority of New York and New Jersey, Port Authority of NY & NJ Board of
Commissioners, Kenneth J. Ringler Jr., Executive Director, Port Authority of NY & NJ, Port
Authority Police Department, Samuel J. Plumeri Jr., Director of Public Safety/Superintendent of
Police, Port Authority Police Department, Christopher Trucillo, Chief, Port Authority Police
Department, Sergeant Goldberg, Port Authority Police, Anthony Espinal, Port Authority Police
Officer, Paulsen, Port Authority Police Officer, Port Authority Police Officer, Lieutenant, Port
Authority Police, unknown at present, Port Authority Police Sergeant, unknown at present, John
Doe I, Port Authority Police Officer, unknown at present, John Doe II, Port Authority Police
Officer, unknown at present,

Defendants-Appellees,

_____

consolidated for disposition with

_____

Matthew R. Weasner,

Plaintiff-Appellant,

v.                                                    No. 08-1895-cv

Anthony Passalaqua (#174), Long Island MacArthur Airport Police Officer, Town of Islip, New York, Pete McGowan, Town of Islip Supervisor, Long Island MacArthur Airport Police Department, and Greg Decanio, Chief of Patrol, Long Island MacArthur Airport Police Department,

Defendants-Appellees,

Suffolk County, New York, Steve Levy, Suffolk County Executive, Suffolk County Police Department, Richard Dormer, Suffolk County Police Department Commissioner, Kevin M. Henry (# 5105), Suffolk County Police Officer, Suffolk County Police Officer, unknown at present (John Doe), Peter Quinn, Inspector, 5th Precinct, Suffolk County Police Department,

Defendants.

———————————————————

Before: POOLER, PARKER, WESLEY, Circuit Judges.

———————————————————

Appellee police officers delayed and in some instances arrested appellants for violating New York's gun laws when they attempted to transport unloaded firearms in checked baggage through various New York airports, in reliance upon 18 U.S.C. § 926A, a statute which, under certain circumstances, allows gun owners to transport firearms interstate without incurring criminal liability under local gun laws. Upon review, we agree with Judge Cogan of the United States District Court of the Eastern District of New York that: (1) Section 926A is not enforceable through 42 U.S.C. § 1983, (2) appellants Torraco's and Weasner's rights to be free from false arrest were not violated, and (3) appellants' rights to travel were not infringed. Accordingly, we AFFIRM. Judge Wesley concurs in the judgment and in Parts I and II-B & C of the opinion of the Court, and files a separate concurring opinion.

Torraco v. Port Authority of New York & New Jersey,

Stephen P. Halbrook, Fairfax, Virginia, for Plaintiffs-Appellants.

2

Kathleen Gill Miller (Milton H. Pachter , Joan F. Bennett, <u>on the brief</u>),

New York, N.Y., <u>for Defendants-Appellees</u>.

<u>Weasner v. Suffolk County, New York</u>

Richard E. Gardiner, Fairfax, Virginia, <u>for Plaintiff-Appellant</u>.

Richard Carl Imbrogno, New York, N.Y., <u>for Defendants-Appellees</u>.

_____

POOLER, <u>Circuit Judge</u>:

In these cases, which we heard in tandem and now consolidate for disposition, plaintiffs-appellants John Torraco and William Winstanley appeal from a March 24, 2008 judgment of the United States District Court for the Eastern District of New York (Cogan, <u>J.</u>) dismissing their claims against Sergeant Lawrence Goldberg, police officers Anthony Espinal and Paulsen, and other appellees. Plaintiff-appellant Matthew Weasner appeals from an April 17, 2008 judgment, also of the Eastern District of New York, dismissing his claims against police officer Anthony Passalaqua and other appellees. The district court resolved both cases through summary judgment.

All three appellants complain of the actions taken by appellee police officers when appellants attempted to transport unloaded firearms in checked baggage through various New York airports. Appellants followed Transportation Safety Administration ("TSA") regulations, <u>see</u> 49 C.F.R. § 1540.111(c)(2),[1] and relied upon 18 U.S.C. § 926A ("Section 926A"), a statute`

---

[1] Section 1540.111(c)(2) of the Title 49 of the Code of Federal Regulations provides that a passenger may not transport or offer for transport in checked baggage any unloaded firearm, unless:

> (i)     The passenger declares to the aircraft operator, either orally or in

3

which allows individuals to transport firearms from one state in which they are legal, through another state in which they are illegal, to a third state in which they are legal, provided that several conditions are met, without incurring criminal liability under local gun laws. All three appellants were interviewed and delayed from traveling, and two – Torraco and Weasner – were arrested by officers seeking to enforce New York gun laws criminalizing the possession of a firearm without a New York firearm license. See N.Y. Penal Law §§ 265.01(1), 265.20(3); see also Bach v. Pataki, 408 F.3d 75, 78-82 (2d Cir. 2005) (describing New York's gun laws in detail).[2] Torraco and Weasner do not possess New York firearm licenses, and are precluded from

---

> writing, before checking the baggage, that the passenger has a firearm in his or her bag and that it is unloaded;
>
> (ii)    The firearm is unloaded;
>
> (iii)   The firearm is carried in a hard-sided container; and
>
> (iv)   The container in which it is carried is locked, and only the passenger retains the key or combination.

[2] As we explained in Bach,

> New York regulates handguns primarily though Articles 265 and 400 of the Penal Law. Article 265 creates a general ban on handgun possession, see, e.g., N.Y. Penal Law §§ 265.01(1), 265.02(4), with specific exemptions thereto, see N.Y. Penal Law § 265.20. The exemption at issue here is a licensed use exemption defined in Article 400: "[the p]ossession of a pistol or revolver by a person to whom a license therefor has been issued." N.Y. Penal Law §§ 265.20(3) (referencing sections 400.00 and 400.01).
> Article 400 of the Penal Law "is the exclusive statutory mechanism for the licensing of firearms in New York State." O'Connor v. Scarpino, 83 N.Y.2d 919, 920, 615 N.Y.S.2d 305, 638 N.E.2d 950 (1994). Licenses are limited to persons over twenty-one, of good moral character, without a history of crime or mental illness, and "concerning whom no good cause exists for the denial of the license." N.Y. Penal Law § 400.00(1).

408 F.3d at 78-79.

acquiring such licenses because they neither reside nor work in New York State. See N.Y. Penal Law § 400.00(3)(a).

In this suit, all appellants seek to enforce Section 926A through 42 U.S.C. § 1983, all appellants allege infringements of their constitutional rights to travel, and Torraco and Weasner complain of false arrest. The district court rejected these claims, and upon review, we affirm. Before explaining our reasons for doing so, however, we first describe the relevant individual circumstances of each case, stating them, as we must, in the light most favorable to appellants. See Pyke v. Cuomo, 567 F.3d 74, 76 (2d Cir. 2009).

## I. Factual Background

### A. John Torraco

On October 15, 2004, Torraco, who is a citizen and resident of the state of Florida, and his wife, who is not a party to this action, flew from Florida into LaGuardia Airport ("LaGuardia"), New York, from which they went to Franklin Lakes, New Jersey, to stay with Torraco's mother. Two days later, the couple set out for LaGuardia to return to Florida. Torraco's mother first drove them to a friend's house in Queens, New York.[3] Following a brief visit, the friend drove the couple to the airport. During this time, Torraco's unloaded, disassembled gun was in a carrying case kept in the car trunk.

Upon arrival at LaGuardia, Torraco informed the airline ticket agent that he had a gun in a carrying case, which he wanted to check through. The agent tagged the firearm with an orange firearms declaration tag, and advised Torraco that it was standard operating procedure to notify

---

[3] Contradicting his deposition testimony, Torraco's complaint asserts that he and his wife "left New Jersey and drove directly to [LaGuardia Airport]."

the Port Authority Police when a passenger declares a weapon, which she did. Appellee Officer Espinal responded and asked Torraco whether he had a New York license for the firearm. Torraco, who, as noted above, does not, informed Officer Espinal that he was traveling from New Jersey to Florida, and that Section 926A preempted local licensing requirements. Being unfamiliar with Section 926A, Officer Espinal called his superior, appellee Sergeant Goldberg. Upon joining the group, Sergeant Goldberg was informed that Torraco had voluntarily declared his gun at the ticket counter, was coming from New Jersey where he had a residence, and was going to Florida where, in Torraco's view, he was legally authorized to carry the gun without a license. Sergeant Goldberg asked Torraco for paperwork that would establish that he was lawfully in possession of the gun. A TSA supervisor arrived and took the position that Torraco was permitted to transport the weapon without regard to local law. Sergeant Goldberg took the position that Torraco needed to first establish that his possession of the gun was lawful, before the question of whether he could legally possess the gun in New Jersey or Florida became relevant. He and Officer Espinal arrested Torraco for violating New York Penal Law § 265.01(1), which provides that "[a] person is guilty of criminal possession of a weapon in the fourth degree when . . . [h]e possesses any firearm" without a license.[4] Torraco was held for twenty-eight hours, when he was arraigned in Queens County Criminal Court on that charge, and subsequently released on recognizance. His attorney moved to dismiss on the ground of federal preemption, and though the district attorney did not respond to the motion, he cross-moved to

---

[4] There is conflicting testimony in the record as to what happened to Torrraco's then-wife. Torraco testified that she was arrested but released soon after, while Sergeant Goldberg testified that she was not arrested but voluntarily came to the police station. This factual dispute is not relevant to our analysis, however, because she did not join in bringing this suit.

dismiss in the interests of justice. The court denied the district attorney's motion and granted Torraco's motion, finding that the State's failure to respond to Torraco's motion was a concession on the merits.

Torraco subsequently brought this suit in federal court alleging that appellees violated: (a) his right to carry firearms under Section 926A, and (b) his Fourth Amendment right to be free from unreasonable searches and seizures. He sought to enforce both of these claimed rights under Section 1983.

### B.     William Winstanley

Approximately six months later, on April 1, 2005, Winstanley, a citizen and resident of the State of New York, and who, unlike Torraco, has a New York firearm license, underwent a somewhat similar experience at John F. Kennedy International Airport ("JFK"), New York, from where Winstanley was scheduled to fly to Phoenix, Arizona. Winstanley was traveling with more than one unloaded firearm, packed in accordance with TSA regulations. Upon arrival, Winstanley declared his firearms to the ticket agent who, in accordance with protocol, contacted the Port Authority Police. Appellee Officer Paulsen arrived, asked Winstanley for his New York firearm license, which Winstanley presented, asked Winstanley where he was going, to which Winstanley responded – Tucson, Arizona, and asked Winstanley for his concealed weapons permit for Arizona, to which Winstanley responded that he did not have one, nor did he need one because he had a Florida concealed weapons permit, which allowed him to carry a concealed weapon in Arizona. Officer Paulsen disagreed, stating that Winstanley needed a concealed weapons permit for Arizona and when Winstanley asked for a supervisor, threatened to place him

7

under arrest and informed him that he could not board the aircraft.[5]  As the airline with which he was traveling apparently only had one flight a day to Tucson, Winstanley changed his flight to the next day, anticipating that the delay would cause him to miss his flight.  He then proceeded to the Port Authority Police headquarters at JFK and spoke to a lieutenant who agreed that Winstanley did not need a permit to openly carry a weapon in Arizona. When the lieutenant left the room, Winstanley also spoke to a sergeant, who, he testified, showed him, but would not let him examine, a matrix in a folder entitled "Gun Laws of the United States."  The next day, Winstanley returned to JFK, and again declared his firearms at the ticket counter.  As with the previous day, the agent gave him a declaration tag and contacted the Port Authority Police.  An unidentified officer asked him for his New York gun license, which Winstanley produced.  The officer then inspected the gun case and told Winstanley that he had the wrong type of carrying case.  When Winstanley responded that he had transported firearms in that carrying case multiple times from JFK, the officer informed Winstanley that he was free to travel, just not with the carrying case. Winstanley then purchased a compliant gun case from the airline and would have made the flight, except that it was canceled due to weather.  On April 4, 2005, Winstanley called the Port Authority headquarters before heading to JFK, recounted the incidents of his previous two attempts to an officer, and after some back and forth was told that he could travel with his firearms. Upon arrival at JFK, Winstanley was permitted to board the flight to Arizona.

---

[5] Officer Paulsen provides a somewhat different account of this discussion, stating that he called his lieutenant because he was not sure that Winstanley would be permitted to carry the firearms in Arizona, and that after he got off the phone with his lieutenant, and informed Winstanley that his lieutenant asked him to send Winstanley to see him, Winstanley got "irate and screamed at [him]" after which he instructed Winstanley that "if he kept on yelling, he was going to be arrested for disorderly conduct." As noted, however, we take the facts in the light most favorable to appellants.

Together with Torraco, Winstanley subsequently brought this suit in federal court alleging that: (a) Section 926A creates an independent right to transport firearms, and (b) his right to travel was infringed. Like Torraco, he contends that both of these rights are enforceable by an action for damages under Section 1983.

### C.    Matthew R. Weasner

Weasner describes himself as a citizen and resident of the State of Ohio. In early June 2004, however, he was employed by a defense contractor and was staying at a hotel in New Jersey. He had recently traveled to California and Arizona while awaiting a military transport to Iraq.

Almost immediately upon checking into the New Jersey hotel, Weasner received a call notifying him of a family emergency. He purchased the cheapest plane ticket he could find, which departed from Long Island MacArthur Airport ("LIMA"), New York in route to Ohio, and, with all of his property, drove straight from New Jersey to the airport in New York. Included in this property was a Ruger pistol, purchased by his grandfather and given to him by his father, properly unloaded and packaged according to TSA regulations. Weasner had carried that firearm, apparently without incident, on his various trips to or from Ohio and California.

When Weasner arrived at the airport ninety minutes before his flight, he informed the agent at the airline ticket counter that he had a firearm to declare. The agent made a call and soon after appellee Officer Passalaqua arrived and asked Weasner to accompany him to a TSA office, which Weasner did. Weasner explained to Officer Passalacqua that he was passing through New York on his way from New Jersey to his home state, Ohio, and showed Officer Passalaqua his plane ticket. Officer Passalacqua left for about thirty minutes, and when he returned told Weasner

that there was no record of the firearm in the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF") database. Weasner stated that the gun had been purchased by his grandfather before record keeping rules were in effect and thus would only show up in the database if he had used it to commit a crime. During the course of these interactions, Weasner did not alert Officer Passalaqua to Section 926A, though he did tell him that he had complied with the packaging regulations for transporting a firearm and had traveled with it frequently, noting that his gun case included a check tag from the TSA in California. At some point, Officer Passalaqua handcuffed Weasner and led him to a back room, where he was kept, handcuffed, for about twenty minutes. He was then taken to the police station, where he was fingerprinted, and subsequently charged with illegal possession of a firearm under New York Penal Law § 265.01. Weasner made bail that day and flew home to Ohio without his gun. The charges against Weasner were subsequently dismissed.[6]

Weasner later filed suit, alleging that appellees violated: (a) his right to carry firearms under Section 926A, and (b) his Fourth Amendment right to be free from unreasonable searches and seizures. Weasner also seeks to hold the Town of Islip liable under a failure to train or deliberate indifference theory.

## II.    Discussion

### A.    Claims under Section 926A

As we have explained, all three appellants filed suit under Section 1983 premised on violations of Section 926A. The district court concluded that a violation of Section 926A cannot

---

[6] Weasner had to retain and pay an attorney and return to court in New York on several occasions, however, he was subsequently reimbursed.

be enforced though Section 1983, and we affirm.

Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C. § 1983, and allows parties to seek damages against state actors for alleged violations of federal rights. It is enforceable only for violations of federal rights, not merely violations of federal laws. See Gonzaga Univ. v. Doe, 536 U.S. 273, 283-90 (2002); Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989). The three "Blessing factors" enumerated by the Supreme Court in Blessing v. Freestone are traditionally used to determine the existence of a federal right enforceable under Section 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

520 U.S. 329, 340-41 (1997) (citations omitted). This Court, however, has cautioned against applying these factors too strictly, explaining that: "courts should not find a federal right based on a rigid or superficial application of the Blessing factors where other considerations show that Congress did not intend to create federal rights actionable under § 1983." Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 322 (2d Cir. 2005); see also Gonzaga Univ., 536 U.S. at 291 ("[S]tatute books are too many, the laws too diverse, and their purposes too complex, for any single formula to offer more than general guidance.") (Breyer, J., concurring).

With these guidelines in mind, we turn to the firearm law implicated in this case. Section 926A states:

> Notwithstanding any other provision of any law or any rule or regulation of a

11

State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter [18 U.S.C.S. §§ 921 et seq.] from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: Provided, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

18 U.S.C. § 926A. The district court determined Section 926A satisfies the first Blessing factor because it is "phrased in terms of the persons benefitted," and we agree. See Gonzaga Univ., 536 U.S. at 284. Indeed, Congress explicitly "entitle[d]" persons to transport firearms under the terms of Section 926A.

The district court concluded, however, that Section 926A failed to meet the second Blessing factor - that the right protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence:

In authorizing interstate transport of firearms "for any lawful purpose from any place where [a traveler] may lawfully possess and carry such firearm," [Section 926A] offers no standard by which an officer can determine whether the interstate transport is lawful. It would require a local officer, faced with clear evidence of a gun carried in violation under local law, to know the law of all 50 states and their localities to evaluate whether firearms possession in the departure and destination states is lawful and thus preempts local law, an unworkable requirement.

Appellants argue that this analysis erroneously focused on the "practical problems" involved for police officers complying with Section 926A instead of the competency of the judiciary. Appellants are correct that the language of the second factor focuses on whether the rights conferred would be difficult for the judiciary, as opposed to law enforcement officials, to identify and enforce. This "rigid and superficial" application of the Blessing factors, however, is

12

insufficient.  See Wright v. Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 432 (1987) (stating that the "benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights" which were not "beyond the competence of the judiciary to enforce") (emphasis added).  These practical problems, and the accompanying possibility that the fear of increased liability could chill enforcement of firearm regulations, undermine the argument that Congress granted a benefit that was intended to be a individual right. We find no evidence either in the text or structure of Section 926A that would indicate that Congress intended that police officers tasked with enforcing state gun laws should be liable for damages when they fail to correctly apply Section 926A.  See Gonzaga Univ., 536 U.S. at 286 ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit . . . under § 1983.").  Appellees explain this point well:

> [I]f, as Blessing teaches, the Supreme Court believes that judicial difficulty in applying a federal statute in the courthouse is a strong indicator that Congress did not intend to create a damages remedy for violation of that statute, then certainly it is reasonable to presume that a statute such as §926A, which requires a police officer to know the applicable firearm laws of at least two states in each encounter and apply them at the airport ticket counter, was not intended by Congress to create a damages remedy for its violation, especially given the absence of any indication in the statute's text, structure, or legislative history that such a remedy was necessary or desired.

Applying Section 926A to Weasner's and Torraco's claims illustrates the difficulties, faced by judiciary and law enforcement officers, inherent its application.  Prong one of Section 926A asks whether a person "is not otherwise prohibited by [the Firearms Chapter] from transporting, shipping, or receiving a firearm."  18 U.S.C. § 926A.  Section 922(g) describes various categories of individuals – including felons, fugitives from justice, and unlawful aliens,

13

among others – who are not permitted under the Firearms Chapter to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). Problematically, however, Section 926A is silent as to how a police officer encountering an unlicensed person with a firearm is to ascertain that this prong of the statute is met, i.e., that said person is not prohibited by the Firearms Chapter from transporting the firearm. Both Weasner and Torraco claim that the laws of their states of residence, Ohio and Florida, do not require a license for gun possession and that their possession was not prohibited by the Firearms Chapter. Asked to produce documentation of lawful possession, however, neither could. Appellants would have us conclude that Congress intended that a police officer faced with this factual scenario must mutely accept appellants' assurances that their possession is lawful, or potentially be subject to suit for damages.

Similarly, whether Weasner and Torraco satisfied factor three of Section 926A, that the guns were lawful in the state of origin, is, contrary to what one might expect, no simple matter. Because both Weasner and Torraco began the pertinent legs of their travels in New Jersey, their possession and carriage of the firearms in that state needed to be lawful. The New Jersey Code of Criminal Justice makes it unlawful to carry a handgun without a permit. See N.J.S.A. 2C:39-5. The code provides certain narrow exceptions to the permit requirements including that a person may keep a firearm in his "residence, premises or other land owned or possessed by him" without a permit, or may carry said firearm between "one . . . residence and another when moving." N.J.S.A. 2C:39-6(e). That law further provides that guns being carried under subsection (e) "in the course of travel shall include only such deviations as are reasonably

14

necessary under the circumstances." N.J.S.A. 2C:39-6(g). Thus, in Weasner's case, a police officer's liability could turn on the correctness of his on-the-spot determination about whether Weasner's hotel in New Jersey constituted a residence, and whether his trip to Ohio constituted a move. In Torraco's case, a police officer would be obligated to speculate whether Torraco's brief stop in New York prior to proceeding to the airport was "reasonably necessary under the circumstances."

And of course this complexity, though illustrated by, is not limited to the facts of this case. As the district court astutely observed,

> Multiply the fluidity of that scenario by 50 jurisdictions (putting aside issues that might arise as a result of international travel with interim domestic stopovers), and nearly a billion passengers moving through U.S. airports per year, and it becomes apparent that providing a damage remedy under § 1983 for a failure to adequately apply § 926A would be unworkable.

Torraco v. Port Auth., 539 F. Supp. 2d 632, 646 (E.D.N.Y. 2008). Given this complexity and uncertainty, we conclude that Congress did not intend to create federal rights in Section 926A actionable under Section 1983.

We are unconvinced by appellants' response that Section 926A creates a presumption of lawfulness, and is therefore quite simply applied, making a damages remedy under Section 1983 workable. They contend that "Congress intended a per se rule that such travel is lawful under § 926A unless probable cause exists to believe" otherwise. Appellants seem to suggest that officers encountering an individual checking a gun at the airport in a state that does not permit unlicensed gun possession should not even inquire as to whether possession is lawful so long as the individual complied with the "carrying case" and "unload" requirements. Section 926A does not state that it is creating any such presumption- it merely provides that gun owners may travel

15

interstate with their guns unloaded and in carrying cases, as long as a number of other conditions are met – and we decline to read a presumption into the statute. Moreover, the Firearms Chapter explicitly cautions against finding that Congress intended Section 926A to operate at the exclusion of state gun laws:

> No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

18 U.S.C. § 927.

As both the district court and this court conclude that the second Blessing factor prevents the plaintiffs from showing the existence of an individual right, we need not discuss the third factor.

### B. False Arrest

We now turn to Torraco's and Weasner's claims that they were the victims of false arrest when they were arrested for possession of a firearm without a license under New York Penal Law §§ 265.01(1), 265.20(3). Appellees respond that there was probable cause to execute the arrests, and that in any event, the officers are entitled to qualified immunity. The district court agreed with appellees, as do we.

The Fourth Amendment right to be free from unreasonable seizures "includes the right to be free from arrest absent probable cause." Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006). Thus, "the existence of probable cause is an absolute defense to a false arrest claim," id. at 152, and the question with which we are presented is not whether Torraco and Weasner were in fact guilty of violation of the New York statute, but rather whether there was probable cause to

16

believe that they were. "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest," Jaegly, 439 F.3d at 153, i.e., it is "objective rather than subjective." Id. at 154.

With these points in mind, we conclude that the officers had probable cause to believe that Weasner and Torraco were in violation of New York Penal Law § 265.01(1), even assuming that they were aware of the terms of Section 926A. It is undisputed that neither Torraco nor Weasner had a New York license for their weapons. Thus, absent Section 926A, they would be in clear violation of New York law. Moreover, there was also probable cause to believe that appellants did not satisfy Section 926A.

We look to the facts of Weasner's arrest to flesh out these points.[7] At the time of his arrest, Officer Passalaqua knew that Weasner: (1) possessed an unloaded firearm in a carrying case, (2) did not have a license or some other documentation of lawful possession such as a receipt of purchase, and (3) declared that he was flying through New York on his way from New Jersey to Ohio. Officer Passalaqua took the extra step of searching the BATF database to ascertain whether the gun was lawfully possessed, and failing to see Weasner's name, he had

---

[7] We need not go through the specifics of Torraco's arrest because they are largely similar to those of Weasner and compel the same conclusions. Having failed to provide documentation of legal possession, Officer Espinal and Sergeant Goldberg had reason to believe that the first prong of Section 926A was not met.

17

probable cause to believe that Weasner's possession was not lawful under New York law. Further, assuming the Officer knew about Section 926A, there was probable cause to believe that Weasner did not meet its requirements. As noted supra in our discussion of the Section 1983 claim based on 926A, a person acting with reasonable caution could conclude that Weasner was not in lawful possession of the firearm at his point of origin because he may have been in violation of New Jersey's gun laws when he kept a gun in his hotel and traveled with it to Ohio. Officer Passalaqua had two options on these facts – take Weasner at his word and release him, or arrest him. He justifiably choose the latter.

Given the facts and circumstances of the arrests, a person of reasonable caution would be warranted in believing that New York Penal Law § 265.01(1) had been violated and that the requirements of Section 926A were not met. Therefore, appellants were not subject to false arrests.

In view of our conclusion that there was probable cause for the arrests, we also conclude that Weasner's claim against the Town of Islip cannot go forward. "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)). We need not address the first two prongs of this showing since Weasner cannot show that his constitutional rights were violated.

### C. Right to Travel

The appellants allege that their right to travel was violated. The right to travel is

18

implicated in three circumstances: (1) when a law or action deters such travel; (2) when impeding travel is its primary objective; and (3) when a law uses any classification which serves to penalize the exercise of that right. See Town of Southold v. Town of East Hampton, 477 F.3d 38, 53 (2d Cir. 2007). Categories two and three are clearly inapplicable here - New York's firearm laws are facially neutral and are not designed primarily to impede travel. Further, we have made clear that "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right." Id. at 54 (internal citation omitted). Assuming that the actions the defendants took did in fact deter these plaintiffs under category 1, the most-inconvenienced plaintiff was delayed a little over one day. This was a minor restriction that did not result in a denial of the right to travel.

**III.    Conclusion**

For the reasons explained, we affirm the judgment of the district court.

19

WESLEY, *Circuit Judge*, concurring:

I join the majority's holdings affirming the dismissal of plaintiffs' § 1983 claims based on their legal theories of: (1) false arrest under the Fourth Amendment; (2) municipal liability against the Town of Islip; and (3) violations of the constitutional right to travel. I also agree with the majority that the district court properly granted summary judgment in favor of defendants with respect to plaintiffs' § 1983 claims based on 18 U.S.C. § 926A. Nevertheless, I am unpersuaded by the path the majority takes to reach that conclusion, and write to describe the alternative basis upon which I would resolve the difficult questions presented by this appeal.

The majority holds that § 926A does not create a federal right. In doing so, it reasons that the second factor from *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) — which relates to the institutional competence of the judiciary to adjudicate a § 1983 claim — "prevents the plaintiffs from showing the existence of an individual federal right" under § 926A. Op. at **16**. I disagree. In my view, a review of the text of § 926A leads to the

inescapable conclusion that Congress created an individual federal right by enacting this provision. Specifically, the statute provides a limited right to a safe harbor from state-law convictions based on charges relating to the unlawful possession of firearms. The right arising out of § 926A is available if, and only if, the statutory prerequisites to its application are satisfied. The right is therefore qualified and narrow, but not, as the majority holds, non-existent. And, of course, individuals transporting firearms are not without other legal protections; their interactions with law enforcement are subject to a number of well-established constitutional rights, the violation of which may be redressed through several long-recognized theories brought pursuant to § 1983.

But remedies under § 1983 are not available for the violation of every federal right. In my view, the right created by § 926A provides an example of this principle. Consequently, my disagreement with the majority does not necessitate a dissent. Two of the statute's features are central to this analysis: (1) § 926A creates a right to a defense that may be raised to avoid a criminal conviction, which must be analyzed against the backdrop of remedies

2

available through direct appeals, writs of habeas corpus and other collateral attacks, and § 1983 claims based on constitutional violations; and (2) the prerequisites to the availability of the right arising out of § 926A are legal in nature, and raise the sort of questions that are rarely, if ever, foisted upon officers in the field. I agree with the majority that potential liability for police officers under § 1983 based on violations of § 926A would unduly hamstring law enforcement and pose troubling practical problems. These concerns, however, do not allow us to ignore the text of § 926A. Accordingly, for the reasons set forth below, I am of the view that § 926A creates an individual federal right, but that violations of this right are not redressable in a private action pursuant to § 1983.

## I.  The Analytical Framework

The issue of whether § 1983 is available as a means of redressing violations of § 926A presents, at bottom, a question of statutory interpretation. The basic tools at our disposal for engaging in such an inquiry are well-established. *See, e.g.*, *SEC v. Dorozhko*, 574 F.3d 42, 46 (2d Cir. 2009). In undertaking this task, however, the majority declines to fully explain the legal framework that

3

guides our analysis.

The majority focuses on the principle that a § 1983 claim will lie only where an individual federal right — not merely a federal law — is alleged to have been violated. *See, e.g., Gonzaga Univ. v. Doe*, 536 U.S. 273, 279-82 (2002). In determining whether a statute creates such a right, the three factors identified in *Blessing* provide "general guidance." *Id.* at 291 (Breyer, J., concurring). As the majority notes rather emphatically, "courts should not find a federal right based on a rigid or superficial application of the *Blessing* factors." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 322 (2d Cir. 2005). We must also be mindful, though, that § 1983 "'means what it says' and authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119 (2005) (quoting *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)). "In the usual case, if the words of a statute are unambiguous, judicial inquiry should end, and the law is interpreted according to the plain meaning of its words." *Devine v. United States*, 202 F.3d 547, 551 (2d Cir. 2000). Thus, we may not interpret the *Blessing* Court's "general guidance" as a

4

license to disregard unambiguous statutory text in order to avoid the implications of its plain meaning.

But a finding that Congress has created an individual federal right marks the beginning, not the end, of any inquiry into the availability of § 1983 claims. *E.g.*, *Abrams*, 544 U.S. at 120. Under the second step of the *Blessing* framework, "[e]ven if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983." *Blessing*, 520 U.S. at 341; *see also Doe*, 536 U.S. at 284-85 & n.4; *Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005). In this second step, the issue is whether Congress "'foreclosed a remedy under § 1983.'" *Blessing*, 520 U.S. at 341 (quoting *Smith v. Robinson*, 468 U.S. 992, 1005 n.9 (1984)). I would resolve the issues presented by plaintiffs' claims based on § 926A under this second step, and hold that Congress has impliedly foreclosed § 1983 claims based on alleged violations of this statute.

## II. § 926A Creates an Individual Federal Right

Does § 926A create an individual federal right? The *Blessing* Court identified a non-exhaustive list of three

factors to consider: (1) whether the § 1983 plaintiffs fit within the statute's intended class of beneficiaries; (2) whether the entitlement arising out of the statute is so "vague and amorphous" that its enforcement in a § 1983 claim would "strain judicial competence"; and (3) whether the statute "impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 340-41; *see also Burke*, 414 F.3d at 321-22. In holding that § 926A does not confer an individual federal right, the majority takes an overly broad view of the second *Blessing* factor.

Congress enacted § 926A as part of the Firearms Owners' Protection Act ("FOPA"), Pub. L. No. 99-308, § 107(a), 100 Stat. 449 (May 19, 1986), *amended by* Pub. L. No. 99-360, § 1(a), 100 Stat. 766 (July 8, 1986). The statute is the product of a tortured legislative history, which, as one scholar said, gives "meaning to the expression . . . that those who care for the law or for sausages should not watch either being made." David T. Hardy, *The Firearms Owners' Protection Act:  A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 627 n.229 (1987). Section 926A originated in a bill proposed by Senator Robert Dole in the

98th Congress.[1]  The record from the Senate debate regarding

this provision contains a memorandum stating that the

language of Senator Dole's proposal was "unambiguous in

[its] creation of a federal right," but "far too vague to

serve as the basis for preempting state laws coming into

conflict with that right."  131 Cong. Rec. S9101-05 (July 9,

1985).  In light of that concern, the Senate revised the

bill, *see id.*, which was ultimately enacted as part of FOPA,

Pub. L. No. 99-308, § 107(a).[2]  Just months after its

---

[1] Section 107 of Senator Dole's proposal would have amended 18 U.S.C. § 927 to add the following proviso:

> [A]ny provision of any legislation enacted, or of any rule or regulation promulgated, by any State or a political subdivision which prohibits or has the effect of prohibiting the transportation of a firearm or ammunition in interstate commerce through such State, when such firearm is unloaded and not readily accessible, shall be null and void.

131 Cong. Rec. S23-03 (Jan. 3, 1985).

[2] The original version of § 926A stated:

> Any person not prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport an unloaded, not readily accessible firearm in interstate commerce notwithstanding any provision of any legislation enacted, or any rule or regulation prescribed by any State or political subdivision thereof.

Pub. L. No. 99-308, § 107(a).

7

enactment, § 926A was amended to its current form.[3]

The present version of § 926A remains as unambiguous as its predecessors with regard to whether the statute creates a federal right. Subject to a series of prerequisites that limit the manner and circumstances in which a firearm may be transported, § 926A states that "*any person . . . shall* be entitled to transport a firearm" through certain jurisdictions, "[n]otwithstanding any other provision of any law . . . of a State." 18 U.S.C. § 926A (emphasis added). Thus, when the statutory prerequisites are satisfied, § 926A

---

[3] Section 926A, as amended, now states:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this [Chapter 44 of Title 18] from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

18 U.S.C. § 926A.

8

allows individuals to transfer a firearm without being convicted for unlawfully possessing the weapon under the laws of any state through which they pass, or any "political subdivision thereof," between the origin and destination of the transfer (hereinafter, "pass-through" jurisdictions). *Id.*

Based on this text, two of the *Blessing* factors plainly weigh against the majority's conclusion that § 926A does not create a federal right. First, as the majority acknowledges, plaintiffs fall within the class of intended beneficiaries referenced in the text of § 926A. *See* Op. at **12**. The statute also employs strong rights-creating language: "[A]ny person . . . shall" be entitled to invoke the entitlement the statute creates. *See Doe*, 536 U.S. at 284 n.3 (providing examples of "right- or duty-creating language"). Therefore, the first *Blessing* factor militates in favor of the conclusion that § 926A confers an individual federal right.[4]

_____

[4] Although there were disputes about the scope of § 926A during the congressional debates regarding this provision, several legislators referred to the statute as creating a "right." *See, e.g.*, 132 Cong. Rec. H1649-03 (Apr. 9, 1986) (statement of Rep. Fish); 132 Cong. Rec. H1689-03 (Apr. 9, 1986) (statement of Rep. Thomas).

9

Second, there can be no question that this statute is "couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 341; *cf. Muscarello v. United States*, 524 U.S. 125, 134 (1998) (observing, in dicta, that "§ 926A *specifically 'entitle[s]'* a person 'not otherwise prohibited . . . from transporting, shipping, or receiving a firearm' to 'transport a firearm . . . from any place where he may lawfully possess and carry' it to 'any other place' where he may do so" (emphasis added, alteration in original) (quoting 18 U.S.C. § 926A)). Section 926A therefore "unambiguously impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 341. Thus, the first and third *Blessing* factors support the conclusion that the statute creates an individual federal right.

The principal source of my disagreement with the majority relates to its application of the second *Blessing* factor — the competence of the *judiciary* to ascertain whether the would-be right has been violated. *See Blessing*, 520 U.S. at 340. In holding that "the second *Blessing* factor prevents the plaintiffs from showing the existence of an individual right," *see* Op. at **16**, the majority refers almost exclusively to concerns that would arise out of

10

requiring *law enforcement* to apply the statute under pain of liability pursuant to § 1983. *See* Op. at **16**. I share these concerns. I am also aware that *Blessing* is not to be applied in a "rigid or superficial" manner. *Burke*, 414 F.3d at 322. However, in my view, the issues identified by the majority are not relevant to the second *Blessing* factor, irregardless of the manner of its application.

When the *Blessing* Court articulated this factor, the basis for its concern was that, if the "right assertedly protected by the statute" is "vague and amorphous," then a trial court may lack the tools in the context of an individual § 1983 claim to determine whether the putative right has been violated. *See, e.g.*, *Livadas v. Bradshaw*, 512 U.S. 107, 132-33 (1994) ("A particular statutory provision . . . may be so vague and amorphous that determining whether a deprivation might have occurred would strain judicial competence." (internal citations and quotation marks omitted)); *Suter v. Artist M.*, 503 U.S. 347, 363 (1992) (holding that no federal right arises out of a statutory provision stating that "reasonable efforts will be made" to prevent removal of children from their homes). In my view, § 926A raises no such concerns.

11

Plaintiffs' claims based on § 926A, had they proceeded, would have required the district court to simply apply Chapter 44 of Title 18 and several states' firearms laws to the facts of these cases. I am confident that the district court, and any other court charged with such a task, would be capable of making those legal determinations. It seems to me that this observation resolves the application of the second *Blessing* factor, which is at best neutral as to the question of whether § 926A creates an individual federal right. Therefore, the text of the statute demonstrates that Congress created an individual federal right, a result confirmed by reference to the *Blessing* factors.

Of course, that the application of § 926A may be expeditiously resolved from an *ex post* perspective in a courtroom does nothing to obviate the difficulties that may arise out of requiring officers to apply this statute in the field on a real-time basis. However, the issues of whether local law enforcement officers are capable of readily enforcing a federal statute, and whether placing such a burden on those officers is advisable as a policy matter, are distinct from any of the concerns raised by the *Blessing* Court that might militate against a finding that § 926A

12

creates an individual federal right.  It cannot be a defense to a § 1983 claim for a state actor to appear in court and assert that, because a federal right is difficult to enforce or apply, it is no right at all.[5]  If Congress has created a right that strains state actors' resources or competence to enforce, the remedy lies with the political branches. Courts "are not at liberty to second-guess congressional determinations and policy judgments of this order, however debatable or arguably unwise they may be."  *Eldred v. Ashcroft*, 537 U.S. 186, 208 (2003).  Thus, I do not find the practical concerns relied upon by the majority to provide an adequate basis for holding that § 926A does not create a federal right.

In reaching the opposite conclusion, the majority seems to rely on the "canon" that we should avoid endorsing

---

[5] This is particularly true where, as here, the statute is unambiguous with respect to whether it creates an individual right.  By the same token, the Supreme Court has held that there is a defense to a § 1983 claim where the source of the federal right in question expressly or impliedly forecloses recourse to § 1983.  *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14-15 (1981).  As discussed in more detail below, *see infra* Part IV, § 926A is ambiguous with respect to this distinct interpretive question regarding the availability of § 1983 claims.  I would resolve that ambiguity, in part, by relying on the same practical concerns that the majority emphasizes.

statutory interpretations that would lead to absurd results. *E.g.*, *Corley v. United* States, 129 S. Ct. 1558, 1568 & n.6 (2009). In essence, the majority reasons that, whatever the text of § 926A, it would be absurd to interpret the statute to confer an individual federal right because of the "complexity and uncertainty" attendant in the application of § 926A by local law enforcement. *See* Op. at **15-16**. However, even if courts are empowered to employ such reasoning, *but see, e.g.*, *Hamilton v. Lanning*, No. 08-998, --- S. Ct. ----, 2010 WL 2243704, at *16-19 (U.S. June 7, 2010) (Scalia, J., dissenting), my view that § 926A confers an individual federal right does not necessarily lead to the absurd result that the majority seeks to avoid. Rather, my conclusion requires only that the analysis of plaintiffs' claims based on § 926A proceed to the second step of the *Blessing* framework.

In sum, I am loath to imply from the fact that § 926A presents front-line enforcement difficulties that Congress mistakenly, or inartfully, used specific rights-creating terms when crafting this statute. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. . . . When the words of a

14

statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)) (internal citations omitted). We lack the authority to ignore the words chosen by Congress in § 926A, which, in my view, create an individual federal right.

## III. The Nature of the Right Arising out of § 926A

In *Blessing*, the Supreme Court criticized the plaintiffs for "paint[ing] with too broad a brush" by failing to specifically describe the rights they sought to vindicate through their § 1983 claims. 520 U.S. at 342.

> It was incumbent upon [the plaintiffs] to identify with particularity the rights they claimed, since it is impossible to determine whether [the statute], as an undifferentiated whole, gives rise to undefined "rights." Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.

*Id.* Thus, under *Blessing*, a discussion of the nature of the individual right arising out of § 926A is in order.

I agree with the majority that, like the *Blessing* plaintiffs, plaintiffs here have framed their claims around an overly broad reading of § 926A. In each of their

15

pleadings, they refer without specification to a "right to travel in compliance with 18 U.S.C. § 926A." However, the text of § 926A does not create an individual right to transport a firearm at any time of the transporter's choosing, free from regulatory investigation or delays. Nor, as the majority points out, does the statute require local law enforcement to apply a "presumption" that an individual's possession of a firearm is lawful, notwithstanding the lack of a permit from the jurisdiction in question or some other form of proof. *See* Op. at **15–16**.

Rather, § 926A creates a "negative" right to avoid convictions and related sanctions in pass-through jurisdictions between the origin and destination of a firearm transfer.[6] This limited right is qualified by five

---

[6] "[T]hat a right is a . . . 'negative right' does not diminish its status as a right." *Croll v. Croll*, 229 F.3d 133, 148 n.3 (2d Cir. 2000) (Sotomayor, J., dissenting), *abrogated on other grounds by Abbott v. Abbott*, 130 S. Ct. 1983 (2010). "The distinction between affirmative and negative rights, though its legitimacy has been much disputed in academic circles, continues to find favor with the Supreme Court." *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 937 n.22 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 43 (1997); *see also, e.g., DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."); *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 103 n.16 (2d Cir. 1951) ("Copyright is, in fact, only a negative right to prevent

prerequisites that must be satisfied before the transferor

may invoke the statute's protection:

> (1) the firearm transfer must not be "otherwise prohibited" by Chapter 44 of Title 18, which relates to federal firearms offenses;

> (2) the "purpose" of the transfer must be "lawful";

> (3) the origin of the transfer must be a "place where [the individual] may lawfully possess and carry such firearm";

> (4) the destination of the transfer must also be a place where the transferor "may lawfully possess and carry such firearm"; and

> (5) the firearm must be unloaded during the transfer, and "neither the firearm nor any ammunition being transported [may be] readily accessible or . . . directly accessible from the passenger compartment of [the] transporting vehicle."

18 U.S.C. § 926A. The first four of these prerequisites

require applications of state and federal law, and the right

only attaches where all five prerequisites are established

to the satisfaction of either local law enforcement or a

court.

When the right does attach, it functions as a criminal

defense that may be employed to avoid a conviction based on

state-law charges of illegal gun possession. In addition to

---

the appropriation of the labours of an author by another.").

its text, this interpretation of the statute is supported by the references to § 926A as a "safe harbor" in the congressional debates that led to its enactment. For example, in the words of Representative Betty McCollum:

> This provision is designed to be a "safe harbor" for interstate travelers. No one is required to follow the procedures set forth in section 926A, but *any traveler who does cannot be convicted of violating a more restrictive State or local law* in any jurisdiction through which he travels.

132 Cong. Rec. H4102-03 (June 24, 1986) (emphasis added); *see also* 132 Cong. Rec. S8215-01 (June 24, 1986) (statement of Sen. Thurmond).[7] A "safe harbor" is "[a] provision . . . in a statute or regulation . . . that affords *protection from liability or penalty*." *Black's Law Dictionary* 1453 (9th ed. 2009) (emphasis added). In my view, that is *precisely* how § 926A operates — it provides a right to protection against a conviction on state-law weapon-possession charges.

_____

[7] Additionally, Senator Howard Metzenbaum described the language of the original version of § 926A, Pub. L. No. 99-308, § 107(a), as "mak[ing] clear that it is the intention of Congress that State and local statutes and regulations shall remain in effect except that in certain narrow circumstances involving travel through one or more States other than the State of residence, *a defense is available to prosecutions under State and local gun control laws*." 131 Cong. Rec. S9101-05 (July 9, 1985) (statement of Sen. Metzenbaum) (emphasis added).

18

The "teeth" of this negative statutory right and the criminal defense that it makes available come from the Supremacy Clause.  In other words, when the right arising out of § 926A applies, the state law in question must yield to the federal law that Congress enacted to create this safe harbor.[8]  This characteristic of the statute was acknowledged, and its efficacy as a policy decision was debated, throughout the legislative history of § 926A.  *See, e.g.,* H. Rep. No. 99-495, at 5, 20 (Mar. 14, 1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1334, 1354; *see also* 131 Cong. Rec. E5359-02 (Dec. 3, 1985) (memorandum from the staff of the House Judiciary Committee); 131 Cong. Rec. S8686-01 (June 24, 1985) (statement of Sen. Hatch).  Indeed, one of the most noticeable differences between the original

---

[8] I am mindful that § 926A's neighbor in the criminal code, 18 U.S.C. § 927, warns against interpreting any provision of the firearms chapter, Chapter 44 of Title 18, "as indicating an intent on the part of the Congress to occupy the field in which such provision operates."  *Id.* However, section 926A was originally conceptualized as a proviso to § 927.  *See* 131 Cong. Rec. S23-03 (Jan. 3, 1985) (describing S.49, § 107 "Amendments to Section 927"); *see also supra* note 1.  And, when § 926A applies, it gives rise to precisely the sort of "direct and positive conflict" between state and federal law that compels the conclusion "that the two cannot be reconciled or consistently stand together."  18 U.S.C. § 927.  When such a conflict exists, federal law — here, § 926A — governs.  Therefore, there is no tension between my construction of § 926A and the terms of § 927.

and amended versions of § 926A is that Congress moved the preemption language — "[n]otwithstanding any other provision of any law . . . of a State" — to the beginning of the provision. *Compare* Pub. L. No. 99-308, § 107(a) (May 19, 1986), *with* Pub. L. No. 99-360, § 1(a) (July 8, 1986).

Finally, applying § 926A would not "strain" judicial competence, *Blessing*, 520 U.S. at 341; instead, the statute calls for judicial intervention. Four of the prerequisites to the attachment of the right present the sort of legal questions that we rarely, if ever, require officers in the field to resolve on the spot. In the majority's words, the statute is "silent as to how a police officer encountering an unlicensed person with a firearm" is to determine whether these prerequisites are satisfied. Op. at **14.** I agree. I also infer from this silence that, if the application of the prerequisites to the § 926A safe harbor are unclear in a given case, then the ambiguities are to be resolved by judges in courts instead of by police officers at busy airport terminals. If a judge determines that the prerequisites were satisfied at the time of the firearm transfer, then the right attaches and the transferor may not be convicted of a state-law offense relating to the unlawful possession of the weapon.

20

Therefore, having conducted the inquiry called for by the *Blessing* Court relating to the specific nature of the federal right upon which plaintiffs' claims are premised, I am of the view that § 926A provides a negative right to a safe harbor — in the form of a preemption-based criminal defense — against state-law weapons-possession convictions in pass-through jurisdictions. This right is only available where the statutory prerequisites are satisfied, and the application of the right will often have to be resolved in courts in the context of criminal cases brought under the laws of pass-through jurisdictions.

This right is qualified and narrow. Contrary to plaintiffs' assertions, nothing in § 926A affords private citizens a right to immediately check a firearm as part of their luggage and board an airplane. Nor does the text of the statute provide a right to avoid delays that may result from law enforcement's efforts to determine whether a firearm is lawfully possessed, so long as the investigation is consistent with the federal Constitution and the laws of the jurisdiction in question. However, to the extent my construction of this federal right appears to be exceedingly narrow, nothing about my interpretation of § 926A would limit citizens' access to the full panoply of constitutional

21

claims that may be brought pursuant to § 1983 based on allegations of unlawful searches, seizures, detentions, or prosecutions. Claims for, *inter alia*, false arrest, excessive force, and malicious prosecution remain available as means for seeking redress where a state actor goes too far.

## IV. The District Court Properly Granted Summary Judgment in Favor of Defendants

Once the scope of the right arising out of § 926A is properly framed, two insights emerge. First, because § 926A is only violated when an individual is *convicted* of unlawfully possessing a weapon in a pass-through jurisdiction despite complying with the five prerequisites of the statute, plaintiffs' rights under the statute were not abridged.[9] Torraco successfully relied on § 926A as a defense to the New York State criminal charge against him.

---

[9] The Third Circuit recently reasoned in an analogous fashion in *Revell v. Port Authority of New York & New Jersey*, 598 F.3d 128 (3d Cir. 2010). There, the court (impliedly) assumed that § 926A created a federal right that could support a § 1983 claim, but held that the plaintiff had not alleged that § 926A was violated because the fifth statutory prerequisite was not satisfied; that is, the firearm in question was "readily accessible," 18 U.S.C. § 926A, during the transfer. *Id.* at 136; *cf. Torraco v. Port Auth. of N.Y. & N.J.*, 539 F. Supp. 2d 632, 645 n.8 (E.D.N.Y. 2008) (reasoning that Torraco "was not entitled to the protection of § 926A" because he stopped at a friend's house in Queens while en route to the airport).

Similarly, although the record is unclear as to the basis for the dismissal, there is no dispute that the gun-possession charge against Weasner was also dismissed. Finally, while the travel delays experienced by Winstanely were unfortunate, the inconvenience that resulted did not violate the terms of § 926A. Therefore, as no plaintiff established that the federal right arising out of § 926A was violated, defendants were entitled to summary judgment.

The second insight yielded by careful attention to the contours of § 926A applies more broadly. In my view, even if plaintiffs' rights under this statute were violated, Congress has impliedly foreclosed access to § 1983 as a means of seeking redress for such harms. The Supreme Court has not often reached this conclusion. *See Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788, 793 (2009). However, this holding is the sounder way to resolve the vexing issues arising out of the interaction between § 926A and § 1983.

In the three instances in which the Supreme Court has held that Congress impliedly foreclosed recourse to § 1983, "the statutes at issue required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit." *Id.* at 795 (citing *Rancho Palos Verdes*, 544 U.S. at 122, *Smith,* 468

23

U.S. at 1011-12, and *Sea Clammers*, 453 U.S. at 6).  The alternative remedial schemes created by the statutes under consideration in *Sea Clammers*, *Smith*, and *Ranchos Palos Verdes* were "unusually elaborate, carefully tailored, and restrictive."  *Id.* (internal quotation marks omitted).  In *Fitzgerald*, the Court reasoned that allowing § 1983 claims to coexist with such procedures would permit § 1983 plaintiffs to "'circumvent' the statutes' provisions" in a manner that "would have been 'inconsistent with Congress' carefully tailored [remedial] scheme[s].'"  *Id.* (quoting *Smith*, 468 U.S. at 1012).  By contrast, the *Fitzgerald* Court concluded that the remedies available for a violation of § 901(a) of Title IX, 20 U.S.C. § 1681(a) — *i.e.*, the withdrawal of federal funding from the violating entity and an implied private cause of action for the aggrieved — were no more elaborate or carefully tailored than the remedies and procedures created by § 1983.  *Fitzgerald*, 129 S. Ct. at 795-96.  Therefore, the Court held, the plaintiffs' § 1983 claims based on alleged violations of Title IX could proceed.  *Id.* at 797.

The right arising out of § 926A, as well as the remedies available for a violation thereof, are different

24

from the rights and remedies that have been examined by the Supreme Court in this line of cases. Whereas *Sea Clammers*, *Smith*, and *Rancho Palos Verdes* involved statutes that created positive entitlements, § 926A creates a negative right that restricts states from imposing convictions under certain circumstances. Moreover, Congress wrote into § 926A a series of prerequisites that will often require judicial resolution before the application of the right can be resolved. Recourse to the courts for resolution of the application of this right provides, in my view, the first step of the remedial scheme for addressing potential violations of § 926A. Finally, the legal defense arising from the statute's preemptive function operates in an entirely different context: state and federal criminal law. We "can assume Congress legislated against [the relevant] background of law, scholarship, and history . . . ." *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 169 (2004). Therefore, the backdrop provided by state and federal criminal laws looms large in the analysis of the rights and remedies arising out of the application of § 926A.

What, then, is the available remedy when a state-law conviction is obtained in violation of § 926A? The most

directly available remedial mechanisms for those who are convicted in violation of this statute under the color of state law are direct appeals challenging the criminal conviction in question, and habeas corpus proceedings in both the state and federal courts. Additionally, in limited circumstances, money damages may also be available based on constitutional claims under § 1983 relating to wrongful arrest, prosecution, or incarceration.[10] But the primary remedy for a violation of § 926A is to vacate the state-law conviction at issue. The remedial mechanisms available on direct appeal, in habeas corpus proceedings, and in other forms of collateral attacks are more than adequate to achieve that end, where appropriate.

These remedies are subject to a detailed body of procedural law that includes, but is not limited to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Similar to the remedial mechanisms referenced in *Fitzgerald*, AEDPA creates "particular procedures" — including exhaustion

---

[10] Money damages were unavailable in the statutes at issue in *Sea Clammers*, *Smith*, and *Rancho Palos Verdes*. *See Fitzgerald*, 129 S. Ct. 795 n.1. Consequently, the limited availability of money damages in the context of criminal charges that conflict with § 926A is not problematic insofar as the *Blessing* analysis is concerned.

requirements and a limitations period that is different from the limitations period that governs § 1983 claims — that must be followed before federal habeas relief is available. *See* 28 U.S.C. §§ 2244(d), 2254(b)-(c).  Moreover, under the "favorable termination" doctrine of *Heck v. Humphrey*, an incarcerated litigant may not circumvent the procedural requirements of AEDPA by filing a § 1983 claim instead of a federal habeas petition, if success on the merits of the § 1983 claim would "necessarily demonstrate[] the invalidity of the conviction" in question.  512 U.S. 477, 481-82 (1994).  We have reasoned that this doctrine is necessary because, "if § 1983 were *always* available, the procedural and the other like requirements of the federal habeas statute would be rendered nugatory."  *McKithen v. Brown*, 481 F.3d 89, 100 (2d Cir. 2007) (emphasis in original). Although the favorable termination doctrine would not *always* bar § 1983 claims based on violations of § 926A,[11] the

---

[11] For example, it seems unlikely that the favorable termination doctrine would preclude a § 1983 claim based on an alleged violation of § 926A in situations where:  (1) habeas relief had already been granted; or (2) the plaintiff served his or her sentence of incarceration before commencing the action pursuant to § 1983, in which case habeas relief relating to the conviction itself would be unavailable.  In either instance, "success" in the § 1983 action would not "necessarily demonstrate the invalidity of [the § 1983 plaintiff's] confinement or its duration."

27

concerns arising from the divergent procedures available under AEDPA and in § 1983 claims are similar to the concerns that led the Supreme Court in *Sea Clammers*, *Smith*, and *Ranchos Palos Verdes* to hold that Congress had impliedly foreclosed recourse to § 1983. For similar reasons, I would conclude that Congress had done the same here.

I recognize that this analysis is not without its own difficulties, and that applying this line of authority in the manner I have posited would require an extension of existing case law. However, I am persuaded that such an extension is appropriate — and that § 1983 is not available as a remedy for violations of § 926A — based on a second, weightier consideration presented by these appeals. In the instances in which the Supreme Court has held that a statutory remedial scheme impliedly foreclosed actions under § 1983, the "crucial consideration" has been "what Congress intended." *Fitzgerald*, 129 S. Ct. at 793-94 (internal quotation marks omitted); *see also Rancho Palos Verdes*, 544 U.S. at 120 (noting that a defendant may defeat the presumptive availability of a § 1983 claim "by demonstrating that Congress did not intend that remedy for a newly created

---

*Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

28

right"). While the text and legislative history of § 926A indicate quite clearly that Congress intended to create an individual federal right, these same sources of authority are silent with respect to § 1983 claims. The text of § 926A is therefore ambiguous with respect to this interpretive quandary. This ambiguity provides the only acceptable opportunity, as a matter of statutory interpretation, for courts to take into account the manner in which § 1983 liability based on officers' application of § 926A would lead to potentially crippling practical problems.

In light of the practical concerns described by the majority, it is difficult to imagine, in the absence of a more direct manifestation of such an intent, that Congress wished to subject law enforcement officers to liability under § 1983 based on good-faith attempts to apply § 926A.[12] In other words, the text of the statute and its "legislative

---

[12] Thus, although I would reach a different conclusion than that of the majority, I rely in part on the same practical concerns that weigh heavily in its analysis, *see* Op. at **13-15**, as well as the analysis of the other courts that have grappled with these issues, *see, e.g., Revell v. Port Auth. of N.Y. & N.J.*, No. 06 Civ. 0402, 2009 WL 901855, at *6-7 (D.N.J. Mar. 31, 2009); *Russo v. Port Auth. of N.Y. & N.J.*, 2008 WL 4508558, at *2 n.5 (E.D.N.Y. Sept. 30, 2008); *Torraco*, 539 F. Supp. 2d at 644-46.

history give[] no indication that Congress intended such a result." *Smith*, 468 U.S. at 1012. The inference that Congress did not intend to permit § 1983 claims based on violations of § 926A finds further support in the nature of the prerequisites that must be satisfied before the application of the right can be resolved. Determining whether the statutory defense is available in a given criminal case involves questions of federal and state law that neither Congress nor the courts typically call upon officers in the field to definitively address while they conduct criminal investigations. This consideration is insufficient to contravene the rights-creating language in the text of § 926A, but it provides an adequate basis to conclude from an otherwise-ambiguous statute that Congress did not intend to create § 1983 liability where an officer concludes, erroneously but in good faith, that an individual without a gun permit is unlawfully possessing a firearm.

The Third Circuit has noted that "[i]t seems doubtful that, in passing § 926A, Congress intended to impose upon police officers such a potentially burdensome requirement." *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 137 n.15 (3d Cir. 2010). I would go one step further. It strains credulity to read § 926A as suggesting that Congress wished

to:  (1) require officers to obtain instant recall of, *inter alia*, the federal firearms laws as well as the fifty states' gun-permit regulations; and (2) subject officers to liability under § 1983 each time they made an incorrect on-the-spot determination about the lawfulness of an interstate firearm transfer.  Therefore, in my view, § 926A must be interpreted as impliedly foreclosing recourse to § 1983 in instances where the limited negative right created by the statute is violated.  Accordingly, although I disagree with the majority to the extent it holds that § 926A does not confer an individual federal right, I concur in the disposition of plaintiffs' § 1983 claims based on § 926A and join the majority in all other respects.  I do so because: (1) plaintiffs' rights under § 926A were not violated, as no plaintiff was convicted of a state-law offense in contravention of § 926A; and (2) even if there had been such a conviction, I would hold that a violation of § 926A is not redressable in an action pursuant to § 1983.